Argued and submitted October 2, affirmed November 20, 1979

# STATE OF OREGON,
*Respondent,*

*v.*

# RICHARD LEE SINGLETON,
*Petitioner.*

(TC 76-2322, CA 10080, SC 26223)

602 P2d 1059

Marianne Oswald, Deputy Public Defender, Salem, argued the cause for petitioner. With her on the briefs was Gary D. Babcock, Public Defender, Salem.

Robert C. Cannon, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were James A. Redden, Attorney General, Walter L. Barrie, Solicitor General, and Donald Paillette, Assistant Attorney General, Salem.

TONGUE, J.

DENECKE, C.J., specially concurring.

## TONGUE, J.

Defendant seeks reversal of his conviction for murder on the ground that the trial court improperly denied his motion to suppress a video taped incriminating statement made by him the morning after he had told interrogating officers that he wanted to call an attorney. The Court of Appeals affirmed the conviction, holding that the officers were not prohibited from asking defendant the next day whether he had changed his mind and that defendant was then informed twice of his right to an attorney and agreed to waive those rights and to make the video taped statement. 39 Or App 9, 591 P2d 369 (1979). We allowed defendant's petition for review.

In considering the problems presented by this case the facts are all-important. On the afternoon of October 26, 1976, State Police Officer Herlinger, in the course of investigating the death of one Leonard Estes, "contacted" defendant at his residence near Canyonville. Detective Leis was also present. Defendant was then arrested. At that time he was told the reason for his arrest and was informed of his "*Miranda* rights" by the reading of a card which included the following, among other things:

> "It is my duty to warn you before you make any statement that:
> "1. You have the right to remain silent.
> "2. Anything you say can and will be used against you in a court of law.
> "3. You have the right to talk to a lawyer and have him present with you while you are being questioned.
> "4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.
> "5. You have the right to interrupt the conversation and invoke these rights at any time."

Defendant was then taken to the Sheriff's office in Roseburg and turned over to Sergeant Stuart of the Oregon State Police and Detective Winningham.

Meanwhile, neither Officer Herlinger nor Detective Leis asked defendant any questions and he did not make any statements.

Officer Stuart and Detective Winningham then again advised defendant of his "*Miranda* rights" by reading a "*Miranda* card" to him. They testified that they read the card in its entirety and that he "indicated" that he understood his rights as explained to him on that card. Defendant signed that card.

After being interrogated for a short time the defendant was taken by the officers to a video taping room where the officers "played" a portion of a video taped statement by a Mr. Pettibone, who had previously been charged as a co-defendant for the same murder. Upon viewing that video tape defendant said that he wanted to talk to his attorney before making any statements.

The interview was then stopped. According to Officer Winningham, defendant was told that he would be taken to the jail, where "you'll be able to phone your attorney." He also testified that they told defendant, "* * * you can go up to the jail and make your phone call and we'll stop in to talk to you tomorrow," and that defendant said: "That would be fine." The officers also asked defendant who his lawyer was and were told that "it was an attorney by the name of Farrell." They testified that defendant told them that Mr. Farrell was "probably out of town," or "running around," and that "he would contact him * * * the following day."

Defendant testified, however, that he did not say that he would not call his attorney that night because he "might be running around town," but that it was his assumption that he would be able to get in touch with him that evening. Defendant testified that after being taken to the jail he "asked for a phone call two or three times" that evening and never got it, but was told, "We'll see about it" or "We'll take care of it."

[92]

Defendant also testified that the next morning he did not ask again to make a telephone call until he was "downstairs" with the officers (Stuart and Winningham) again; that the officers had previously asked him if he "would like to go downstairs"; that he said "yes"; that they asked if he had contacted a lawyer; that he said "no" and that he had not been allowed to make a phone call; that he hadn't contacted his lawyer; that perhaps he would like to have the court appoint one before talking to them, and that the officers said that they would "check into it."

Officers Stuart and Winningham testified, to the contrary, that they did not tell anyone not to allow defendant to call a lawyer; that the next morning at about 8:30 a.m. they asked him if he had contacted his lawyer and that defendant said only that "he hadn't done that"; that they "asked him if he wanted to come down and listen to what we had to say, and he said that he didn't have anything to add to what he said before, but he was willing to come down and listen"; that at no time during that morning did he ask for his lawyer or express a desire to have an attorney present.

Defendant was then again advised of his constitutional rights by the reading to him of a third card identical with the previous cards and at 8:37 a.m. on that date that card was also signed by him under the following printed statements:

"DO YOU UNDERSTAND EACH OF THESE RIGHTS I HAVE EXPLAINED TO YOU?

"Having these constitutional rights in mind, I am willing to waive these rights.

"Signature:    /s/ Richard Singleton"

After a short period of interrogation, defendant admitted that he was "involved." Defendant was then asked for permission to search his residence and pick-up truck. According to Officer Stuart, defendant said that he would consent to this. At 8:42 a.m. defendant signed a slightly different "Oregon State Police Advice

of Rights—Statement," including substantially the same statements as in paragraphs 3, 4 and 5 of the two cards previously signed by him. On the back of this third card was a further "advice of rights to obtain permission to search," including his right not to allow the search, followed by the statement that "having these rights in mind * * * I consent to a search of cabin #3 and vehicle located at Drifters Trailer Ct., Canyonville." Defendant signed that statement at 8:44 a.m.

Defendant testified that the "blanks" describing his residence and pickup truck were not filled in when he signed the card consenting to the search. One of the officers testified, to the contrary, that the description of defendant's residence and vehicle were on the "card" when defendant signed it.

Defendant was then interviewed by the officers until just before 9:00 a.m., when "it was stopped to set up the video taping equipment." At 9:06 a.m., at the beginning of the video taping, a fourth "*Miranda* warning" card in the same form as the first and second cards signed by him was read to the defendant, including his "right to talk to a lawyer and have him present while you are being questioned." That card was also signed by the defendant under the printed statement that "having these constitutional rights in mind, I am willing to waive these rights." The officers also testified that defendant "indicated" to them that he understood his rights and would be "affirmatively willing to talk to (them) about the case."

From the video taped interview, it appears that defendant was relaxed and was smoking a cigarette; that the last "*Miranda* card" which "warned" him of his constitutional rights, including his right to counsel, was read to him and signed by him; that he then said that he understood those rights and was willing to talk. He then described in detail his participation in the murder of Mr. Estes. At the conclusion of the statement defendant was asked why he had "changed his mind" (and had decided to make a statement), and

he replied that it was his "inner soul." He also stated, in response to questions, that he had been treated fairly; that the officers had been "honest" and that there had been no threats. At no time during the video taped interview did the defendant indicate any desire to invoke any of the constitutional rights as read to him or complain that he had been coerced or induced to waive his rights or to make the statement by any improper conduct by the police.

Defendant's subsequent motion to suppress his video taped statement was based solely upon the ground that he had previously "indicated" that he wished to consult an attorney and was "thereafter questioned by the officers." That motion was supported by an affidavit to the same effect and which made no claim of coercion or inducement by otherwise improper words or conduct, nor any claim that he had been denied an opportunity to call and consult an attorney.

At the time of the hearing on the motion, however, defendant testified that the officers told him that he would "feel better" to "get it off your chest" and that "maybe they [the officers] just conned me into [the statement]" and that during the "taping" he was "just mixed up" and was "scared." The officers admitted that one of them told the defendant that he "could understand how [defendant] would feel about a situation such as that and how he might react in the same way [defendant] did."[1]

It is not entirely clear just when these statements were made. According to the officers, they may have been made both "on the 27th" and also "on the 26th." It would appear, however, that at least one "*Miranda* card" was read to defendant before any such statements were made to him on the 26th and that at least

---

[1] The "situation" apparently involved sexual molestation of a daughter of Mr. Pettibone (the co-defendant) by the decedent. In his video taped statement defendant said that he was outraged by that conduct during the subsequent incident in which decedent was killed.

one or more "*Miranda* card" was read to defendant and signed by him before any such statements were made to him on the 27th. According to defendant, however, those statements were made "after the taping," possibly referring to the playing of the video taped statement by Mr. Pettibone on the previous day, October 26th.

At the time of the hearing on defendant's motion to suppress his video taped statement defendant also testified that it had been "almost a year" since then and that his memory was "a little vague about everything in respect to what took place a year ago." He admitted, however, not only that three of the "*Miranda* cards" were read to him and that he signed them, but that he "understood those" at that time. Defendant then was 41 years of age and had gone to school through the eleventh grade.

These three cards included the card read to the defendant and signed by him prior to the "interview" with him on the morning of the second day and also the card read to him and signed by him at the beginning of the video taped interview. As previously stated, those cards "warned" defendant of his "*Miranda* rights," including his right to remain silent and his "right to talk to a lawyer and have him present with you while you are being questioned." They were also signed by him under the printed statement:

"Having these constitutional rights in mind, I am willing to waive these rights."

At the conclusion of that hearing, and in denying defendant's motion to suppress, the trial judge made the following statements of his reasons for that ruling:

"* * * there are two issues as the Court sees it.

"Number one, is any statement made voluntarily made; secondly, if it is, was it made with full knowledge of a person's constitutional rights.

"I have not seen another case where there were as many warnings from the night of the arrest through the morning of the 27th.

[96]

"In looking at the tape, and I think I'm entitled to do that, to consider at least the testimony of Mr. Singleton in regard to this, and I do credit him with saying that it's been a year ago and if you asked me what was on the tape last week, I wouldn't have been able to tell you. It comes from some of his statements that he understood what he was doing and that he wanted to make this statement.

"The cases that I recall say certainly he has—a defendant has a right to remain silent but he also has a right to change his mind in respect to that.

"The evidence here convinces me certainly by a preponderance and by a great preponderance of the evidence that, number one, Mr. Singleton was aware of his constitutional rights; secondly, with knowledge of those that he voluntarily made the statement * * *."

In allowing defendant's petition for review, this court asked counsel to address the following questions in oral argument:

(1) With reference to the language of *Brewer v. Williams,* 430 US 387, 97 S Ct 1232, 51 LEd 2d 424 (1977), requiring a showing of intentional relinquishment or abandonment of a known right or privilege, what is there in this record to demonstrate that the defendant had chosen to waive his previously invoked right to assistance of counsel? To what extent, if at all, is waiver demonstrated by clear and convincing evidence?

(2) To what extent, if at all, did the statements and questions of the police put to the defendant during the second day constitute "continuing interrogation" under the *Miranda* doctrine?

(3) To what extent, if any, was the defendant deprived of an opportunity to obtain access to counsel on the facts in this record?

1. *The "totality of circumstances" shows that there was a knowing and intelligent waiver by defendant of his right to counsel.*

Defendant contends in his petition for review that "the totality of circumstances" fails to show that defendant intentionally relinquished or abandoned his

"verbalized desire" to remain silent and to have consultation with his attorney. It has also been suggested, but not by this defendant, that once a defendant, upon or after arrest, exercises his constitutional right to consult with an attorney, not only must the police then cease any further questioning, but that right cannot thereafter be waived except after consultation with, if not also in the presence of, an attorney.[2]

This court has not for some years directly addressed the question whether a defendant who, upon being advised of his "*Miranda* rights," demands his right to consult with an attorney, can thereafter waive that right and, if so, under what circumstances.

In *State v. Atherton,* 242 Or 621, 410 P2d 208 (1966), as in this case, the defendant, upon being informed by the police of his "legal rights," told them that he had an attorney and that until he had seen his attorney he had nothing more to say. Two days later he told the police the same thing. After two more days the officers visited the defendant in his cell. Defendant then confessed. This court affirmed defendant's conviction, holding (at 627):

> "If the defendant was properly advised, voluntariness then becomes a question of fact."

and, (at 628):

> "After a person is arrested and accused of a crime, the Fifth Amendment denies the government the right to force him to admit his guilt. The Sixth Amendment requires the government to advise him of his right to counsel and see that he has an attorney, if he wants one, at all times after the adversary phase of the prosecution has commenced. Nothing, however, in the philosophy underlying these two great guardians of freedom requires the police to refrain from discussing a crime with a suspect who wants to discuss it, if he has been fully advised of his rights and has decided to talk in spite of his knowledge that he need not do so. Once it is shown that an

---

[2] *See* 1 ABA Standards for Criminal Justice, Providing Defense Services, § 7.3, pp. 153-54 (1974).

accused knew what he was doing when he talked to the police, and that he did so with full knowledge of his rights, he ought to be just as responsible for his decision to talk as he is for his decision to commit the crime in the first place."

Justice Denecke, joined by Justice Sloan, dissented, apparently for the reason, among others, that "[t]he majority reasons that by confessing, the defendant ipso facto waived his right to remain silent and his right to the assistance of counsel." (at 629-30).

This court held to the same effect as in *Atherton,* under similar facts, in *State v. Rosenburger,* 242 Or 376, 409 P2d 684 (1966), Justices Denecke and Sloan again dissenting.

In *State v. Sanford,* 245 Or 397, 421 P2d 988 (1966), defendant, after being informed of his rights also said that he wished to call his attorney. He was not successful in doing so and claimed that he was afforded no opportunity to call (as in this case). The next day the officer asked defendant if he had talked to his attorney yet and was told that he had not (also as in this case). Defendant then said that he didn't think it was necessary to do so and gave a statement. In affirming his conviction this court said (at 404):

"Defendant's evidence concerning coercion was extremely weak and was rebutted by the state. The court found he was fully advised of his right to counsel and to remain silent, and that the statement was voluntarily given.

"The question of whether or not an accused has been adequately advised of his rights and has nevertheless waived them is one of fact for the court."

Justices Denecke and Sloan again dissented (at 406), expressing the view that once a defendant had retained an attorney "there can be no interrogation except in the presence of counsel or upon the clear termination of the attorney-client relationship."

In *State v. Whitewater,* 251 Or 304, 445 P2d 594 (1968), defendant, upon being taken before the district

[99]

court where he was informed of his constitutional rights, asked that counsel be appointed to represent him. The police officer, in escorting the defendant back to the jail, asked him if he were willing to talk about the matter and the defendant then confessed. Again, the court affirmed the conviction, citing *State v. Rosenburger, supra,* and *State v. Atherton, supra,* again over a dissent by Justice Denecke, joined in by Justice O'Connell. It does not appear whether the defendant, before making the statement, was again informed of his rights and then expressly waived them, either orally or by signing a "card" to that effect, as in this case.

More recently, in State v. Haynes, 288 Or 59, 602 P2d 272 (1979), this court, under different facts, again rejected any "per se" rule to the effect that once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel, as held in *People v. Hobson,* 39 NY 2d 479, 348 NE2d 894, 384 NYS 2d 419 (1976), *Commonwealth v. McKenna,* 355 Mass 313, 244 NE2d 560 (1969), and *Commonwealth v. Hilliard,* 471 Pa 2d 318, 370 A2d 322 (1977). This court in *Haynes* stated (at 70) that:

> "As in *Atherton,* we do not hold that an arrested person, not yet indicted or formally charged with the crime, cannot voluntarily and after proper warnings waive consultation with counsel and make voluntary statements which will be admissible against him."

and, (at 71-72) that a defendant's right of access to a lawyer "may be waived just as the right to remain silent itself may be waived," although the state "has the burden to show an intelligent relinquishment or abandonment of a known right or privilege."

Meanwhile, decisions by the Supreme Court of the United States subsequent to its "landmark" decision in *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 LEd

2d 694 (1966), have served to clarify somewhat the application of that decision in such cases. In *Miranda* the court said (at 473-74):

"Once warnings have been given, the subsequent procedure is clear. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to the police, they must respect his decision to remain silent."

and (at 475):

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel."

As stated by counsel for defendant, "the door left open" by *Miranda* to "continued interrogation" has been the subject of further debate. The Court, in *Michigan v. Mosley,* 423 US 96, 96 S Ct 321, 46 LEd 2d 313 (1975), although under different facts, said (at 102-03) that:

"It is evident that any of these possible literal interpretations would lead to absurd and unintended results. To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purpose of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be

read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent."

The Court went on to add (at 104):

"We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' "[3]

In *Brewer v. Williams,* 430 US 387, 97 S Ct 1232, 51 LEd 2d 424 (1977), as also pointed out by counsel for defendant, the court again, under different facts, said (at 403-04) that:

"The District Court and the Court of Appeals were correct in the view that the question of waiver was not a question of historical fact, but one which, in the words of Mr. Justice Frankfurter, requires 'application of constitutional principles to the facts as found * * *.' (Citations omitted)

"The District Court and the Court of Appeals were also correct in their understanding of the proper standard to be applied in determining the question of waiver as a matter of federal constitutional law— that it was incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.' *Johnson v. Zerbst,* 304 U.S., at 464. That standard has been reiterated in many cases. We have said that the right to counsel does not depend upon a request by the defendant (citations omitted), and that courts indulge in every reasonable presumption against waiver (citations omitted). This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical state of pretrial proceedings. (Citations omitted)

"We conclude, finally, that the Court of Appeals was correct in holding that, judged by these standards, the record in this case falls far short of sustain-

---

[3] Although *Mosley* dealt with an assertion of the right to remain silent, it has been held that the police must also "scrupulously honor" requests for counsel. To this effect, *see State v. Stone,* 397 A2d 989, 994 (Me 1979); *People v. Clark,* 45 NY 2d 432, 408 NYS 2d 463, 380 NE 2d 290 (1978); *United States v. Rodriguez-Gastelum,* 569 F2d 482 (9th Cir 1978).

[102]

ing petitioner's burden. It is true that Williams had been informed of and appeared to understand his right to counsel. But waiver requires not merely comprehension but relinquishment * * *."

The court in *Brewer* then undertook an analysis of the facts of that case, in the light of these standards, and concluded that although the defendant in that case understood his right to counsel, it had not been proved that he intended to relinquish that right.

More recently, in *Fare v. Michael C.,* 442 US 707, 99 S Ct 2560, 61 LEd 2d 197 (1979), also under different facts, the court stated as follows (99 S Ct at 2571-72):

"*Miranda* further recognized that after the required warnings are given the accused, '[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. 384 U.S., at 475, 86 S Ct at 1628. We noted in *North Carolina v. Butler,* _____ U.S., at _____, 99 S.Ct.at 1757, that the question whether the accused waived his rights 'is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived his rights delineated in the *Miranda* case.' *Thus, the determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation,* to ascertain whether the accused in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel. *Miranda v. Arizona,* 384 U.S., at 475-477, 86 S.Ct., at 1628-1629.

"This totality of the circumstances aproach is adequate to determine whether there has been a waiver * * *." (Emphasis added)

We agree with the contention by the state that in the light of the Supreme Court's statement in *Fare v. Michael C.,* and *North Carolina v. Butler,* the analysis

of whether the state has "carried its burden" in cases such as this must be viewed in light of the "totality of the circumstances." Indeed, the defendant in this case agrees that this is the proper test.

Based upon these cases and authorities, we hold that when in such a case a defendant, after arrest and upon being questioned by the police, exercises his right to remain silent and also informs the police of his desire to exercise his right to consult with an attorney, the police must "scrupulously honor" those rights; that when in such a case it is contended by the state that the defendant has subsequently waived those rights there is a presumption that the waiver was involuntary and the state has a "heavy burden" to demonstrate that the defendant knowingly and intelligently waived those rights; and that the determination whether there was such a waiver is to be made upon an inquiry into "the totality of the surrounding circumstances." We also hold that in such a case the question of waiver is not simply a question of historical fact, but one which requires the application of constitutional principles to the facts as found.

With these rules and standards in mind, we proceed to an analysis of the evidence in this case.

When defendant told the officers on the evening of October 26, 1976, that he wanted to talk to a lawyer before making any further statements, he also said that it would be "fine" for them to "stop in to talk to [him] tomorrow." The next morning, when the officers did so, they asked if he "wanted to come down and listen to what we had to say" and he agreed to do so, stating that he "didn't have anything to add," but "was willing to come down and listen."

It is true that defendant testified that the evening before he asked the jailer "for a phone call two or three times" and that the next morning he again told the officer that he wanted to talk to a lawyer. In addition, defendant testified that he was told by the officers

that he would "feel better" to "get it off his chest"; that he was "conned" by them and was "mixed up" and "scared" when he made the video taped statement. However, defendant's credibility was impeached at least substantially and the trial court apparently did not believe that testimony, which is discussed further below.[4]

It is also true that Singleton was apparently told by one of the officers that he "could understand how (defendant) would feel about a situation such as that and how he might react in the same way [defendant] did." It also appears, however, that before these statements were made and immediately upon being taken "down" from the jail the police read to the defendant another "*Miranda* card" by which he was again specifically advised of his right to remain silent and to consult a lawyer. He signed that card under the printed statement that he understood his rights and was "willing to waive these rights."

Before defendant made his video taped statement two further "*Miranda* cards" to the same effect were also read to defendant and signed by him. The officers also testified that defendant "indicated" that he understood his rights as stated on those cards.

From a viewing of defendant's video taped statement, it also appears that at the beginning of that statement the last of these cards was read to defendant and signed by him and that he then stated that he understood those rights and was "willing to waive these rights." At the conclusion of that statement defendant stated that there had been no "threats" and that the police had been "honest" with him.

At the conclusion of the hearing on defendant's motion to suppress the statement, after hearing the testimony of the officers and the defendant, and after also viewing his video taped statement, the trial judge

---

[4] Also discussed separately is defendant's contention that his rights were violated by " 'continued interrogation' proscribed under Miranda * * *."

found that the state had proved by "a great preponderance of the evidence" that defendant was "aware of his constitutional rights" and that he made that statement "voluntarily."

After examining a transcript of the testimony and after also viewing defendant's video taped statement, we also hold that the defendant not only understood his right to counsel, but that he knowingly and intelligently intended to relinquish and waive that right. Whether the "measure" of the state's "heavy burden of proof" is to be stated as requiring proof by a "preponderance" of the evidence, by "satisfactory" evidence, or by "clear and convincing" evidence, we believe that the evidence offered by the state satisfied such a burden of proof.[5]

2. *Any "continuing interrogation" did not invalidate defendant's subsequent waiver of his right to counsel.*

Defendant's petition for review contends that:

"Confrontations of evidence and sympathetic conversations designed to elicit statements from defendant, subsequent to his stated desire to remain silent and consult his attorney, constitute 'continued interrogation' proscribed under *Miranda v. Arizona,* 384

---

[5] It is contended by the state that under both the decision of the Supreme Court in *Lego v. Twomey,* 404 US 477, 489, 92 S Ct 619, 30 LEd 2d 618 (1972), and the decision of this court in *State v. Brewton,* 238 Or 590, 603, 395 P2d 874 (1964), the measure of the burden of proof which must be carried by the state in such a case is to prove that a defendant knowingly and intelligently waived his right to counsel by no more than a preponderance of the evidence.

To the same effect, *see United States v. Glover,* 596 F2d 857, 865 (9th Cir 1979), and *Keiper v. Cupp,* 509 F2d 238, 241, n. 5 (9th Cir 1975).

In *State v. Brewton,* 238 Or 590, 603, 395 P2d 874 (1964), this court said that:

"The burden will rest on the state to prove to the satisfaction of the court that the confession was voluntary."

Justice O'Connell specially concurred, stating (at 605) that:

"* * * in my opinion the confession should not be submitted to the jury unless the trial judge is convinced beyond a reasonable doubt that it was voluntarily made."

US 436, 86 S Ct 1602, 16 LEd 2d 694 (1966) and its progeny as a protection against involuntary waiver of constitutional rights."

In support of this contention defendant refers to the testimony that after he informed the officers of his desire to consult an attorney, they not only continued to question him but attempted to induce him to talk by telling him that they could understand how he would feel in "that situation" and did not know how they would react in such a "situation," and by telling him that he would "feel better" to "get it off his chest."

Before discussing these contentions, it is of interest to note again that no such contentions of "inducement" appear in defendant's original motion to suppress or in the affidavit in support of that motion, it being contended only that after telling the officers, on October 26, 1976, of his desire to consult an attorney, the officers, on the morning of October 27, 1976, "again contacted me and resumed questioning me * * *."

As stated by the Supreme Court of the United States in *Michigan v. Mosley, supra* (at 102), "[t]o permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of Miranda * * *." In that case, however, further interrogation after an interval of two hours was held not improper, although under different facts.

Of more controlling importance, in *Brewer v. Williams, supra,* despite much more flagrant facts, including the "Christian burial" speech by an officer to a defendant (who they knew to be deeply religious and a former mental patient) only a short time after defendant had consulted a lawyer and after assuring defendant and his lawyer that they would not interrogate him, the Court declined to adopt a "per se" rule to the effect that such conduct, in and of itself, would invalidate any subsequent confession. Instead, the Court undertook to determine by an analysis of the historical facts of that case whether that subsequent

confession was made by that defendant following a valid relinquishment and waiver of his right to counsel.

The facts of this case are far different than those of *Brewer.* In this case there was an interval of over 13 hours between defendant's initial claim of his right to consult a lawyer and any further questioning, during which the police "scrupulously observed" defendant's claim of right. During that interval defendant did not actually talk to an attorney and his testimony that he attempted unsuccessfully to call an attorney is subject to disbelief. Defendant's testimony that the officers told him that he would "feel better" to "get it off his chest," even if true, was far less compelling as a psychological inducement than the "Christian burial" speech in *Brewer.* The "sympathetic situation" speech by the officers in this case was also far less compelling as a psychological inducement than the "Christian burial" speech.

Finally, in this case it is clear that immediately before any further interrogation on the second day, and again immediately before defendant's video taped statement, the defendant was again advised of his constitutional rights by the reading of three additional "*Miranda* cards," which he signed as an express waiver of those rights and which he quite clearly understood before doing so, whereas in *Brewer* there was no such evidence. In other words, in this case defendant was not subjected to further interrogation after claiming his right to counsel until after he had expressly waived that right both before being questioned and before making any statement.

In viewing the historic facts of this case in the light of the constitutional standards set forth above, we hold that the defendant in this case not only understood his constitutional rights, including his right to counsel,

but that he intended to relinquish them and made a knowing and intelligent waiver of those rights.[6]

### 3. *The alleged "deprivation of access to counsel."*

As previously stated, upon the allowance of defendant's petition for review, and in a letter to counsel prior to oral argument before this court, we expressed interest in hearing argument upon the additional question: "To what extent, if any, was the defendant deprived of an opportunity to obtain access to counsel on the facts of this record?"

Upon examining this record, however, we find that defendant's motion to suppress and the affidavit in support of that motion made no such contention.[7] As a result, the state, not being put on notice of such a contention, may not have called witnesses who might have been called, and the trial court was not put on notice that it should make findings of fact on the question whether defendant was "deprived of an opportunity to obtain access to counsel."

---

[6] Other cases have also distinguished *Brewer v. Williams* on similar grounds. *See United States v. Rodriguez-Gastelum,* 569 F2d 482, 485 (9th Circuit 1978) wherein the facts of *United States v. Pheaster,* 544 F2d 353 (9th Cir 1976) were reexamined. *See also United States v. Hauck,* 586 F2d 1296, 1298 (8th Cir 1978).

[7] That motion asked that the video taped statement be supressed

"* * * for the reason that after being advised of his rights, defendant indicated that he wished to consult an attorney and was thereafter questioned by said officers, and in response to said questions, made oral admissions regarding the crime alleged in the above-entitled case."

That motion was supported by defendant's affidavit, stating that:

"Upon being advised of my *Miranda* rights by Detective BYRON WINNINGHAM of the Douglas County Sheriff's Office at 5:40 p.m. on said date [October 26, 1976] I stated that it was my desire to consult with an attorney. Some questioning followed, during which time I continued to refuse to discuss the matter. At 6:55 p.m. on said date I was lodged in the Douglas County Jail.

"On October 27, 1976, at 8:35 a.m., Sergeant JOHN STUART of the Oregon State Police and Detective BYRON WINNINGHAM of the Douglas County Sheriff's Office again contacted me and resumed questioning me regarding the charges in the above-entitled case. At this time I had not been afforded my right to consult with an attorney. After some questioning I did make an incriminating statement * * *."

[109]

It also appears that, despite some testimony by the defendant at the hearing on defendant's motion to suppress to the effect that he asked the jailer if he could make "a telephone call" and that the next day he again told the officers that he wanted to talk to an attorney (which they denied), no direct contention was made in either defendant's brief in the Court of Appeals or in his petition for review to this court that he had been "deprived of an opportunity to obtain access to counsel."

In addition, it appears from an examination of the record that the trial judge did not believe that testimony by this defendant, and for good reasons.

First of all, that testimony by the defendant was but one of several statements made by him which were either directly refuted or apparently untrue for other reasons. Also, defendant did not testify that on the evening of October 26th he was denied an opportunity to call an attorney, but only that he asked the jailer if he could make "a telephone call." He did not testify that he told the jailer that he wanted to call an attorney and was denied the right to do so. As a realistic matter, considering the apparent fact that in such a jail it is likely that on any given day a jailer may be requested by several prisoners to make "a telephone call" for many reasons or purposes this jailer could not be expected to remember whether on this particular day this defendant made a request to make "a telephone call." A jailer might remember such an incident if he had been given any special instructions relating to this particular prisoner. The officers testified, however, that they did not tell anyone to deny defendant an opportunity to call his lawyer.

Defendant had also testified that earlier on that same day he made repeated requests to the officers for counsel and was told by them that "it was the weekend and they couldn't do nothing about it." That testimony was obviously untrue because October 26, 1976, was a

Tuesday. The officers also testified that on October 26th defendant told them that his attorney was "probably out of town" or "running around" and that "he would contact him *the following day.*"

Defendant also testified at the time of the hearing that the next day, October 27th, he again asked the officers for counsel after they came to see him at the jail. They specifically denied this and testified that they asked defendant if he had contacted his lawyer and that defendant said only that "he hadn't done that."

Defendant testified at the time of the hearing that when he gave the video taped statement he was "scared" and that he had been "conned" into making that statement. Yet he appeared to be completely relaxed, at ease and smoking a cigarette when he repeated the grisly details of the murder and at the conclusion of that statement specifically stated that he had been treated "fairly" and that the officers had not only made no threats, but had been "honest" with him.

In addition, defendant testified at the hearing, in response to a specific question by the trial judge at the conclusion of his testimony, that his memory was "a little vague about everything in respect to what took place a year ago" and that "[i]f someone asked me what happened on the tapes last week, I don't think I could have told them."

If it were true that defendant had been refused by the jailer a request to call an attorney, it would seem to be obvious that he would have told his attorney of that fact and that his attorney, in preparing the motion to suppress, would have included that specific fact in defendant's supporting affidavit and would have made the direct contention, as one of the grounds for the motion, that defendant had been "deprived of an opportunity to consult counsel."

On this record, we believe it to be clear that the trial judge considered defendant's belated testimony to

the effect that he was "deprived of an opportunity to obtain access to counsel" to be an afterthought and that he had good reasons to disbelieve that testimony.

We also believe it to be clear from the record in this case that the trial judge considered and rejected this same testimony by the defendant in deciding the primary issue submitted to him by defendant's motion to suppress, *i.e.,* the question whether, considering the "totality of circumstances," the state had sustained its burden to prove that prior to making the video taped statement there had been a knowing and intelligent waiver by defendant of his right to consult an attorney.

For these reasons, and on this record, we hold that the trial court did not err in denying defendant's motion to suppress and we affirm the decision by the Court of Appeals.

**DENECKE, C. J.,** specially concurring.

I concur in the decision of the majority. I specially concur to state my opinion that the decision in this case is not inconsistent with the position I stated in my dissents in *State v. Atherton,* 242 Or 621, 410 P2d 208, *cert den* 384 US 1025, 86 S Ct 1982, 16 L Ed2d 1030 (1966); *State v. Rosenburger,* 242 Or 376, 409 P2d 684 (1966); *State v. Sanford,* 245 Or 397, 421 P2d 988 (1966); and *State v. Whitewater,* 251 Or 304, 445 P2d 594, *cert den* 384 US 1023, 86 S Ct 1946, 16 L Ed2d 1025 (1968).

Unlike the present case, *Atherton* and *Sanford* had already retained attorneys and consulted with them. In *Rosenburger* and *Whitewater,* the indigent defendants had asked the magistrate to appoint counsel but immediately after their requests and before counsel could be appointed the police interrogated the defendants.