Argued and submitted January 30, 2019, reversed and remanded
February 10, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ERNEST LEE DEAN,
*Defendant-Appellant.*

Clatsop County Circuit Court
14CR02802; A164189

481 P3d 322

Defendant appeals from a judgment of conviction for several crimes related to the robbery of a hotel. On the day of defendant's arrest for those crimes, he was taken into police custody and, after he invoked his right to counsel, detectives informed him in detail of the evidence they had discovered that implicated him in the robbery. Soon after, while still in custody, defendant confessed to the robbery despite detectives repeatedly reminding defendant that he had invoked his right to counsel. Defendant moved to suppress the incriminating statements, and the trial court denied the motion. On appeal, the issues are whether the detectives violated defendant's right to counsel under Article I, section 12, of the Oregon Constitution, and, if so, whether defendant's subsequent waiver of that right was valid in light of the earlier violation. *Held*: The trial court erred in denying defendant's motion to suppress. The detectives violated defendant's right to counsel when they set out the evidence against him in great detail, and the state failed to meet its burden of proving, under the totality of the circumstances, that defendant made a knowing, intelligent, and voluntary waiver of his Article I, section 12, rights in light of that violation.

Reversed and remanded.

Paula Brownhill, Judge.

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

SHORR, J.

Reversed and remanded.

**SHORR, J.**

An employee at a hotel in Cannon Beach was robbed at gunpoint. Defendant was taken into police custody in Portland and, after he invoked his right to counsel, detectives informed him in detail of the evidence they had discovered that implicated him in the Cannon Beach robbery. Soon after, while still in police custody, defendant confessed to the robbery despite detectives repeatedly reminding defendant that he had invoked his right to counsel. Defendant, who was charged with crimes related to the robbery, moved before trial to suppress the incriminating statements that he had made after invoking his counsel right. The trial court denied the motion, and defendant was convicted of first-degree robbery, ORS 164.415, second-degree kidnapping, ORS 163.225, and possession of a firearm as a felon, ORS 166.270, and he appeals from the judgment of conviction.

The main questions presented on appeal are whether the detectives violated defendant's right to counsel under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution, and, if so, whether defendant's subsequent waiver of that right was valid—that is, given the circumstances, the waiver was knowing, intelligent, and voluntary—in light of the earlier violation. For the reasons explained below, we conclude that the detectives violated defendant's right to counsel when they set out the evidence against him and that the subsequent waiver was not valid. The trial court therefore erred in denying defendant's motion to suppress.[1] We reverse and remand.[2]

---

[1] Because we reverse on the motion to suppress, we need not reach defendant's second assignment of error.

[2] Defendant also raises two assignments of error in a supplemental brief. In a combined argument, defendant contends that the trial court plainly erred when it instructed the jury that it could return a nonunanimous guilty verdict and when it entered convictions for the crimes listed above after the jury had been so instructed. The trial court erred under the Sixth Amendment to the United States Constitution when it gave the nonunanimous jury instruction. *See Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020). However, defendant did not object to the nonunanimous verdict instruction at trial, nor was the jury polled. Defendant argues that, although he did not preserve an objection to the erroneous jury instruction, we should conclude that the court plainly erred and exercise our discretion to review the error. The Supreme Court addressed

We review a denial of a motion to suppress for legal error, accepting the trial court's findings of fact that are supported by constitutionally sufficient evidence in the record. *State v. Doyle*, 262 Or App 456, 458-59, 324 P3d 598, *rev den*, 355 Or 880 (2014). In this case, the court made factual findings in a letter opinion explaining its decision to deny defendant's motion to suppress. The following excerpt is taken from that letter opinion. We discuss additional facts from the record throughout our analysis as needed.

"On January 5, 2014, a man stole cash at gunpoint from the Stephanie Inn in Cannon Beach, Oregon. Lt. Christopher Wilbur investigated the robbery. Portland Police Detective Brett Hawkinson was investigating robberies similar to the Cannon Beach crime. Eventually police determined that defendant Ernest Lee Dean committed the robberies. Defendant was arrested the morning of February 21, 2014 and taken to the thirteenth floor of the Portland Justice Center. Police obtained search warrants from Multnomah County Circuit Court, and they executed the warrants on the day of defendant's arrest.

"One of the search warrants was for defendant's Portland storage unit. Detectives searched the unit for identification, jewelry, cell phones, keys, guns, clothing, strings, wires, electrical tape, and zip ties. They opened bags and boxes while searching for these items.

"At 4:36 p.m. on February 21, 2014, after the warrants were executed, Lt. Wilbur and Detective Hawkinson began an interview with defendant in an interview room equipped with audio and video recorders. Detective Hawkinson read defendant his *Miranda* rights, and defendant signed a form indicating he understood his rights. Defendant was not under the influence of alcohol or drugs, and he was not suffering from any apparent mental illness. Detectives did not promise him anything or pressure him. Detectives Hawkinson and Wilbur were courteous and conversational with defendant. Defendant was alert and articulate, and he is intelligent.

those same circumstances and defendant's argument in *State v. Dilallo*, 367 Or 340, 478 P3d 509 (2020). The court concluded that it was not appropriate to consider the defendant's unpreserved assignment of error because of the absence of a jury poll. *Id.* at 342. Accordingly, for the reasons identified in *Dilallo*, we decline to exercise our discretion to review defendant's supplemental assignments of error.

"Detective Hawkinson explained that he was investigating a robbery. Defendant wanted to know why he was being detained. At 4:55 p.m., when Detective Hawkinson finished reading the arrest warrant out loud, defendant said, 'I'll need a lawyer before I can go any further with you.' Detective Hawkinson said, 'No problem. You are afforded that.' He did not ask defendant any questions, but he told defendant about the searches earlier that day, and he described some of the evidence that implicated defendant in several robberies. When defendant tried to speak, Detective Hawkinson told defendant he did not want defendant to respond. He said he couldn't listen or accept statements from defendant, but he wanted defendant to know why he was in custody. Defendant said he had not robbed anyone, and Detective Hawkinson said he could not accept defendant's answer because he has a right to legal counsel and he's going to get legal counsel before detectives ask any questions.

"Detective Hawkinson gave defendant a cell phone, and defendant called his girlfriend at 5:03 p.m. He returned to the holding cell at 5:04 p.m. Detective Hawkinson told defendant to knock if he needed something. Defendant was dressed in his own clothes, was given a blanket, and was not handcuffed. No one contacted him in the holding cell.

"Defendant knocked at 5:08 p.m. Sgt. Santos responded, and defendant said he wanted to speak to the detective. At 5:10 p.m., Detective Hawkinson contacted him. Defendant said he wanted to talk to him again and have a cigarette. Detective Hawkinson said he would let him smoke, but he would have to get direction about talking. He said, 'I really do want you to have an opportunity to have your lawyer and talk to him. I don't want to trounce your rights at all. You have the right to have a lawyer.' Defendant said he understood but wanted to clear his conscience.

"At 5:26 p.m., Detective Hawkinson and Lt. Wilbur opened the cell, told defendant he was being recorded, gave defendant cigarettes, cuffed him in front, and took him downstairs for a smoke break. Detective Hawkinson told defendant repeatedly that he did not have to talk to detectives. He said, 'You have asked for a lawyer, and you have a right to have that lawyer, okay? I want to make sure that what you're doing is free and voluntary and is completely what you want. And it's not because I'm giving you a smoke break. You've talked to me, okay? And that's what I want

to make sure, because you have rights, and I respect your rights. Okay?' He suggested they finish the smoke break and return to the interview room before he answered defendant's questions.

"When they reached the parking garage in the basement, defendant started talking about how police may have identified him as a suspect. Detective Hawkinson asked him about being followed. Without mention of the robberies for which he was detained, defendant talked about his circumstances, prior criminal involvement, and heroin dealing.

"At approximately 5:36 p.m., when defendant said he remembered the bank (scene of one of the robberies), Detective Hawkinson interrupted and advised defendant of his *Miranda* rights. Defendant said he understood. Detective Hawkinson said he wanted to be sure defendant understood his rights. Defendant said he understood, but he didn't want to take the rap for someone else. Detective Hawkinson said, 'More importantly, and you can say no, okay? I want to make sure it's on record that you are coming to me and you want to talk to me, right? I haven't asked you, I haven't reapproached to ask you any more questions, that I want you to have a lawyer before I ask you any questions. Right? You understand that, right?' Lt. Wilbur noticed defendant was shaking his head, and he asked defendant to speak out loud. Defendant said, 'Yeah. I understand.' Lt. Wilbur said, 'You understand and you want to talk to us?' Defendant said, 'Yeah.' Detective Hawkinson asked, 'And this isn't because I'm letting you smoke?' Defendant replied, 'I know.'

"Defendant told them more about his situation. Around 5:44 p.m., he told detectives he was planning a robbery at Spirit Mountain. Detectives questioned him about his plan, and the conversation continued. He said he took $7,000 from the safe in Cannon Beach.

"At 5:53 p.m., after defendant finished smoking, Lt. Wilbur, another detective, and defendant returned to the interview room on the 13th floor. Detective Hawkinson joined them a few minutes later. Detective Hawkinson advised defendant of his *Miranda* rights again. Defendant said he understood. Defendant read and signed a written *Miranda* form at 5:57 p.m. Detective Hawkinson told defendant he did not have to speak to them at all. Defendant said he understood. At 5:58 p.m., Detective Hawkinson

suggested they start at the beginning. The interview resumed."

Thereafter, defendant made incriminating statements and confessed to the Cannon Beach hotel robbery.

The trial court explained that defendant "unequivocally invoked his right to counsel at 4:55 p.m. when he told detectives he needed to talk to a lawyer before he could go any further." The court noted that, in response, Hawkinson did not ask any questions or allow defendant to speak further, and that Hawkinson's intent in describing the evidence was to "inform defendant of the reason for his arrest, not to elicit incriminating responses." Accordingly, the court reasoned that the pertinent question was "whether [defendant] made a valid waiver of his right to counsel under Article I, [section] 12, of the Oregon Constitution and the Fifth Amendment to the U.S. Constitution when he answered the detectives' additional questions."

The trial court concluded that defendant made a knowing and voluntary waiver of his right to counsel, explaining that,

> "[a]fter [defendant] invoked his right to speak to a lawyer, he had sufficient time to decide whether to talk to a lawyer or to resume the interview with detectives. Once he asked [to speak with] Detective Hawkinson, 18 minutes elapsed before Detective Hawkinson [took defendant from his holding cell], and 28 minutes passed before defendant mentioned the bank. Defendant volunteered the bank comment; it was not a result of custodial interrogation. At that point, Detective Hawkinson stressed defendant's right to talk to a lawyer and repeated defendant's *Miranda* rights. He read the *Miranda* rights a third time in the interview room, and defendant signed another *Miranda* form. Defendant understood he did not have to talk to detectives before he consulted a lawyer, and he chose to speak to them."

On appeal, defendant argues, as he did before the trial court, that Hawkinson's statements to defendant immediately after defendant invoked his right to counsel constituted an interrogation, which amounted to a violation of defendant's Article I, section 12, right against self-incrimination. Defendant further contends that his

subsequent waiver of his right to counsel was invalid because it was a product of that violation. In response, the state acknowledges that defendant invoked his right to counsel but asserts that Hawkinson's post-invocation statements did not constitute interrogation. And, the state argues, if those statements were interrogation, and thus a violation of defendant's *Miranda* rights, defendant's waiver was not the product of the earlier violation, but knowing and voluntary.[3] Thus, we must determine whether Hawkinson's post-invocation statements to defendant constituted interrogation, and, if so, we must determine whether that violation of defendant's *Miranda* rights affected his subsequent waiver to the extent that the waiver was invalid.

Article I, section 12, provides that "[n]o person shall \*\*\* be compelled in any criminal prosecution to testify against himself." Or Const, Art I, § 12. The right against self-incrimination protected under that provision extends to custodial interrogations and includes a derivative right to have counsel present during questioning. *State v. Scott*, 343 Or 195, 200, 166 P3d 528 (2007).

Accordingly, police must give *Miranda* warnings before interrogating suspects in custody, and "[f]undamental to protect the derivative right to counsel is that, when a suspect in custody makes an unequivocal request to speak with a lawyer, all police interrogation must cease." *State v. Fink*, 285 Or App 302, 312, 395 P3d 934 (2017) (citing *State v. Meade*, 327 Or 335, 339, 963 P2d 656 (1998)). Police may continue speaking with a defendant who has invoked the rights to remain silent or to counsel only to ask questions or make statements that are "normally attendant to arrest and custody." *State v. Schmidtke*, 290 Or App 880, 885, 417 P3d 563 (2018). Statements obtained in violation of a defendant's Article I, section 12, rights must be suppressed. *Scott*, 343 Or at 204-05.

---

[3] Defendant and the state argue that the issue on appeal is whether the subsequent waiver of the right to counsel was a "product" of the earlier *Miranda* violation. *See State v. Jarnagin*, 351 Or 703, 716-19, 277 P3d 535 (2012). We understand the issue to be whether defendant's subsequent waiver was nevertheless a knowing, intelligent, and voluntary waiver of his Article I, section 12, rights. *See State v. Ward*, 367 Or 188, 202, 475 P3d 420 (2020). We frame the issue in that manner throughout the rest of the opinion.

When a suspect in custody invokes the right to counsel, the suspect may later waive that right "by initiating further contact with the police." *State v. Acremant*, 338 Or 302, 322, 108 P3d 1139, *cert den*, 546 US 864 (2005). And "even after an Article I, section 12, violation, a suspect retains the power to validly waive the right against self-incrimination 'as long as that waiver is knowing, intelligent, and voluntary under the totality of the circumstances.'" *State v. Schrepfer*, 288 Or App 429, 437, 406 P3d 1098 (2017) (quoting *State v. McAnulty*, 356 Or 432, 455, 338 P3d 653 (2014), *cert den*, 577 US 829 (2015)).

It is readily apparent, and the state does not dispute, that defendant unequivocally invoked his right to counsel when he said, "I'll need a lawyer before I can go any further with you." Therefore, Hawkinson's statements following defendant's invocation violated defendant's right to counsel if those statements constituted interrogation.

An officer's statements were interrogation if those statements were "likely to elicit some type of incriminating response." *State v. Boyd*, 360 Or 302, 319, 380 P3d 941 (2016). An "incriminating response" means "any inculpatory or exculpatory response that the prosecution later may seek to introduce at trial." *Scott*, 343 Or at 203. Questions "normally attendant to arrest and custody" are not interrogation for the purposes of Article I, section 12, unless those questions are "designed" to elicit incriminating information. *Schmidtke*, 290 Or App at 885. Those questions or statements that are normally attendant to arrest and custody may include statements informing the defendant of the charged crime or the reasons for the defendant's arrest. *Id*. at 886. However, when police confront a suspect in custody with evidence of that suspect's guilt, that confrontation can constitute interrogation, depending on the manner in which the suspect is confronted. *Id*. at 887.

*Schmidtke* is illustrative of that rule. In that case, the police officer detained the defendant, placed him in handcuffs, and informed him that he was being investigated for thefts reported in the area. The officer also told the defendant that he had been observed on a surveillance video in the area of the crime. *Id*. at 883. We concluded that the

officer's later statement indicating that the defendant was identified in a surveillance video in the area was interrogation. We came to that conclusion because that statement, which the officer made unprompted, was "not made as part of the statement letting defendant know the criminal conduct for which he was being detained—a type of statement that *** is 'normally attendant to arrest and custody.'" *Id*. at 887. Although the officer in that case could have informed the defendant of the crime for which he was detained without discussing the video, the officer's statement "used the video to explicitly connect defendant to the crime and, thus, to confront defendant with his guilt." *Id*. at 887-88. Those factors "created circumstances under which a reasonable officer in [the officer's] circumstances should have known that the officer's statements were likely to elicit an incriminating response." *Id*. at 888.

Here, defendant asked Hawkinson why he was under arrest, and Hawkinson responded by reading the arrest warrant. At that point, defendant invoked his right to counsel. After defendant's invocation, Hawkinson continued to talk to defendant about the investigation. Hawkinson described the investigation and the evidence of defendant's guilt in detail. Hawkinson told defendant that the police had executed search warrants on defendant's vehicles, motel room, and storage locker. He listed several items found during the execution of those search warrants and explained how those items connected defendant to the charged crimes. Defendant attempted to interrupt Hawkinson, but Hawkinson put his hands up and spoke over defendant to stop him from speaking.

"[Hawkinson:]    Hold on. Hear me out. Because I don't want you to respond. I just want you to know what's coming, okay? So here's the thing—

"[Defendant:]    No, here's the deal. You respond, then I have to respond towards what you are saying. Because I don't feel like, you know, you want me to agree with what you are saying and I can't—

"[Hawkinson:]    Nope, I don't want you to say—I don't want you to say anything. I just want you to understand

because I want to be fair and I want to make sure you understand that, why you're going to jail, and ultimately prison. That's it. Don't respond. Please don't.

"[Defendant:]   You guys, you guys, let me tell you something. Look, I understand with you're—I understand what you're doing, okay. But, from my standpoint I don't feel like, you know, I'm in any, I don't feel like I want to sit here and cater to you. You know, and to—

"[Hawkinson:]   You're not catering to me. I promise you're not catering. I'm trying to be fair to you. I'm trying to let you know why you're under arrest. Do you understand?

"[Defendant:]   Yeah, you just explained that. You just told me—

"[Hawkinson:]   I'm not done.

"[Defendant:]   Okay.

"[Hawkinson:]   I'm not done.

"[Defendant]:   Okay."

Hawkinson continued describing the evidence connecting defendant to various robberies and how the items that police had found during the searches that day implicated defendant in those robberies. Defendant interrupted again to say that he "ha[d] used those items" before Hawkinson told defendant not to speak. Hawkinson told defendant that he could not "accept" defendant's answers or responses because defendant needed an attorney. Hawkinson resumed his explanation of the evidence against defendant, including evidence that defendant rented the vehicles used during the robberies. Hawkinson then told defendant that the evidence he had just described was "just the tip of the iceberg." Defendant attempted to speak several more times, before Hawkinson concluded the interview and gave defendant a cell phone to call his girlfriend.

"[Defendant:]   I will say this—I've never robbed anyone.

"[Hawkinson:]   Okay. And that's—but I'm not—again, I can't accept your answer or your statement, do you understand that? Because you have a right to legal counsel and you're going to get legal counsel before I ask you any questions, okay. I don't want to trounce your rights.

"[Defendant:]   You've already asked questions.

"[Hawkinson:]   Well not after you said you wanted a lawyer though.

"[Defendant:]   Well no, you've, you said I had a right to a lawyer and then you asked questions.

"[Hawkinson:]   That's correct, but you didn't tell me you wanted a lawyer until just a little while ago. So all I've been doing, I want this on record, all I've been doing is letting you know what you're facing, because you asked me, right? And I told you, alright? I'm going to get my phone and I'll let you call [your girlfriend], okay?"

Unlike the trial court, we conclude that Hawkinson's post-invocation statements were interrogation. As in *Schmidtke*, Hawkinson's statements to defendant were unprompted and were not part of his answer to defendant's request to know the crime for which he was arrested. Hawkinson had already read the arrest warrant to defendant—that statement answered defendant's question completely. And defendant indicated that he wanted the presence of counsel, which provided a natural break. Additionally, Hawkinson spent several minutes describing the incriminating evidence discovered during the searches executed that day. In doing so, he explained in detail why that evidence implicated defendant in the robberies, and even told defendant that he wanted defendant to know why he was "going to jail, and ultimately prison." That confrontation was a clear and serious violation of defendant's right to counsel. Although the court found that Hawkinson's intent was merely to inform defendant of the reasons for his arrest, a reasonable officer in Hawkinson's circumstances should have known that Hawkinson's statements were likely to elicit an incriminating response. That defendant continually tried to interrupt demonstrated just how likely that was.

Because Hawkinson interrogated defendant in violation of his Article I, section 12, right to counsel, we must determine whether the state met its burden of showing that defendant's subsequent waiver of that right was valid. *See State v. Foster*, 288 Or 649, 654-55, 607 P2d 173 (1980) ("Our concern, however, is not with the voluntariness of

defendant's statements \*\*\* but with the voluntariness of defendant's signed waiver which preceded his statements. \*\*\* We must therefore ascertain whether the police actions that had occurred on April 11 affected defendant's waiver on April 12."). The state bears the burden of proving, "under the totality of the circumstances, that defendant made a knowing, intelligent, and voluntary waiver of the Article I, section 12, rights at the time of the \*\*\* interrogation." *State v. Ward*, 367 Or 188, 202, 475 P3d 120 (2020). When the state contends, as it does here, that a defendant "validly waived his rights despite an earlier violation, 'there is a presumption that the waiver was involuntary and the state has a heavy burden to demonstrate that the defendant knowingly and intelligently waived those rights.'" *Id*. at 201 (quoting *State v. Singleton*, 288 Or 89, 104, 602 P2d 1059 (1979) (quotation marks in *Singleton* omitted)). That is so because, when police fail to "scrupulously honor" a defendant's invocation of his Article I, section 12, rights, "it can have a particularly significant impact on a defendant's later decision to answer questions." *Id*. at 202-03.

Recently, in *Ward*, the Supreme Court emphasized the heavy burden on the state in overcoming the harm of a prior *Miranda* violation. The court noted that, "[i]n those cases in which we have held that the state proved a valid waiver despite a prior violation, we have pointed to countervailing circumstances." *Id*. at 203. Those circumstances identified in *Ward* included a defendant's reinitiation of conversation after the violation, a defendant's affirmative statements that demonstrated the defendant's "meaningful understanding" of the rights to silence and counsel, and a gap in time between the violation and the defendant's subsequent waiver, if the gap in time is followed by fresh *Miranda* warnings. *Id*. at 204.

The court stressed that any "countervailing circumstances" must be viewed in the context of all the relevant circumstances. For example, in that case, after the initial *Miranda* violation, four days passed before the detectives provided new *Miranda* warnings, drove the defendant five hours to a different county and began the interrogation, at which point, the state contended, the defendant made a

valid waiver of his Article I, section 12, rights. Although there was a substantial gap in time, "any value that the passage of time might normally provide was diluted *** by the fact that defendant was held in jail during that entire time without the benefit of advice from counsel." *Id*. at 205. Similarly, the potential value of the fresh *Miranda* warnings "was undermined by the fact that the detectives gave those warnings at the start of the five-hour trip." *Id*.

The state contends that several factors aid it in overcoming its burden of proving that defendant validly waived his right to counsel. First, the state argues that there was a "clear break" in time between the initial violation and defendant's subsequent waiver.[4] Second, the state contends that the detectives' behavior during that break in time helped to mitigate the harm of the violation, because, after defendant contacted Hawkinson, the detectives did not immediately resume the interrogation or attempt to elicit a *Miranda* waiver. The detectives also took defendant into a new environment—the parking garage—where they allowed defendant to smoke a cigarette. Third, the state points to Hawkinson's repeated assurances to defendant that he did not have to speak with the detectives and that he had a right to counsel. The state also notes that Hawkinson made several attempts to ensure that defendant understood his rights. Finally, the state asserts that defendant did not make incriminating statements during the first unlawful interrogation, which, according to the state, lessened the harm of the violation.

As we explain in more detail below, we conclude that, under the totality of the circumstances, the state failed to meet its "heavy burden" of proving that defendant made a valid waiver of his Article I, section 12, rights. Although the state has identified certain countervailing circumstances, those circumstances are not sufficient to overcome the harm of the initial violation, when viewed in context with all of the relevant circumstances.

---

[4] The state contends that defendant waived his Article I, section 12, rights in the parking garage before the detectives asked defendant questions about his plans to rob Spirit Mountain, in addition to the written waiver that defendant signed before the second interview in the interview room. Our analysis is the same—and we reach the same conclusion—with respect to both waivers.

We begin with a description of the violation. Hawkinson's explanation of the evidence implicating defendant in the robberies prompted defendant to respond several times, and defendant explained that he did not want to sit silently while Hawkinson gave his explanation. Despite the clear effect of Hawkinson's statements in prompting further responses from defendant, Hawkinson persisted in making those statements and repeatedly prevented defendant from responding. That violation created the impression that defendant's assertion of his right was meaningless. Specifically, Hawkinson's actions likely left defendant with the impression that invoking his right merely subjected him to further interrogation without the ability to defend himself from the criminal accusations at issue. Perhaps more concerning, it may have further created the impression that defendant's assertion of his rights would subject him to retribution, because Hawkinson told defendant that he had to listen to Hawkinson's explanation in silence *because* he had invoked his right to counsel.

The substance and manner of the interrogation also likely influenced defendant's later decision to contact Hawkinson. Hawkinson primed defendant to respond by confronting him and then leaving him in his cell to consider the substantial and weighty evidence of his guilt. Hawkinson's behavior in forbidding defendant's responses also frustrated defendant, and likely increased his desire to respond in kind. That defendant did not make incriminating statements in response to the interrogation is of little help to the state, given that defendant's inability to respond likely prompted his later reinitiation of contact.

Given the nature of the violation in this case, we are not persuaded that the mitigating circumstances identified by the state are sufficient to aid it in overcoming its burden. First, defendant remained in custody in the time between the violation and his later waiver. After the violation, defendant was placed in a holding cell, where he remained until the detectives transported him to the parking garage inside of the same building. Moving defendant from one location in the jail to another did not counteract the coercive effects of incarceration.

Second, contrary to the state's assertion, there was no "clear break" between the unlawful interrogation and defendant's subsequent waiver. That assertion fails to account for defendant's reinitiation of contact with the detectives, which is significant for multiple reasons. Defendant reinitiated contact with Hawkinson mere minutes after Hawkinson violated his right to counsel. Because our concern is with the validity of defendant's waiver, the timing of his reinitiation is important—it indicates when defendant made the decision to waive his previously invoked right. Here, the timing of defendant's reinitiation of contact with the detectives suggests that the violation influenced his decision to waive his previously invoked right, particularly when considered in conjunction with the manner and substance of the violation as we explained above. *See State v. Hickman*, 289 Or App 602, 608, 410 P3d 1102 (2017) (the defendant did not waive his previously invoked right by reinitiating conversation with the officer where there was no change in time or circumstance between the impermissible interrogation and the defendant's statement and the statement was "prompted by [the officer's] continued impermissible interrogation").

Additionally, defendant's reinitiation was the catalyst for further contact between defendant and the detectives, which undermined the value that a break in questioning normally provides in overcoming the harm of an earlier violation. Although approximately one hour elapsed between the initial violation and defendant's written waiver, defendant was in direct contact with the same detectives for the majority of the hour long "break." As noted, defendant reinitiated conversation with the detectives minutes after he was placed in the holding cell. At that point, defendant was left in his holding cell for another 18 minutes before he was taken to the parking garage. The conversation in the parking garage lasted between 20 and 30 minutes. Further, defendant made potentially incriminating statements throughout that conversation, referring to at least one prior robbery and another robbery he had planned for the following weekend. Defendant also discussed his method for selecting locations to target, his methodologies for carrying out the robberies, and his financial difficulties at length. *See Scott*, 343 Or at 203 (incriminating statements are anything the prosecution

may seek to introduce at trial). At the end of the conversation in the basement, defendant admitted to stealing $7,000 from a safe in Cannon Beach.

Defendant's contact with and admissions to the detectives during the break in questioning did little to reduce the coercive effect of the violation. That is particularly evident when compared to the amount of contact that occurred during breaks in questioning in prior cases. *See State v. Jarnagin*, 351 Or 703, 723, 277 P3d 535 (2012) (break in time aided state in meeting its burden where the defendant was at home for two to three hours and no officers were present); *Acremant*, 338 Or at 323 (break in time between violation and waiver aided state in meeting its burden where the defendant was left alone in the interview room for one hour). Thus, the events that took place between the violation and the waiver undermined the value that a break in questioning would normally provide.

Third, the detectives' repeated assurances of defendant's rights and defendant's affirmative responses were also insufficient to overcome the harm of the violation, when viewed under the totality of the circumstances. In particular, the nature of the violation in this case undermined Hawkinson's repeated assurances that defendant had rights and that Hawkinson respected those rights. That is, the nature of Hawkinson's unlawful interrogation created—at the very least—confusion with respect to the significance and substance of defendant's right. Hawkinson's restatement of the same rights he had violated a short time earlier did little to dispel that confusion or clarify the treatment to which defendant was entitled after invoking his Article I, section 12, right to counsel.

Considering all of the above circumstances—the detectives' initial failure to honor defendant's invocation and the manner of that unlawful interrogation, the nature of the contact between defendant and the detectives in the time between the first and second interview, and the timing of defendant's reinitiation—in totality, we conclude that the state failed to prove that it obtained defendant's knowing, intelligent, and voluntary waiver of his Article I, section 12, rights either before his conversation with detectives in the

parking garage or the second custodial interrogation in the interview room.[5]

We acknowledge that Hawkinson's repeated administration of defendant's *Miranda* rights—*after* the detectives' initial violation of those rights—and defendant's signed *Miranda* form weigh in favor of a conclusion that defendant's waiver was voluntary. However, we do not consider those subsequent *Miranda* warnings in a vacuum but consider the totality of the circumstances. *See Ward*, 367 Or at 202-06 (any "countervailing circumstances" are viewed in context with all of the relevant circumstances). After defendant invoked his right to counsel, Hawkinson interrogated defendant in great detail and continually instructed defendant not to respond to the evidence presented against him. Hawkinson, despite his protestations that defendant not respond, primed defendant with the detailed evidence and left defendant in his cell to consider the evidence presented against him. We cannot say under those circumstances that defendant's reinitiation with detectives and his written waiver a short time later were enough to overcome the state's heavy burden of demonstrating that the waiver was voluntary in light of the *Miranda* violation that immediately preceded those events.

We also conclude that the trial court's erroneous admission of defendant's statements was not harmless. We affirm a trial court's erroneous ruling if there was "little likelihood that the error affected the jury's verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). "Our analysis turns on the possible influence that those statements had on the verdict and not whether proof of defendant's guilt was compelling even without the statements." *State v. Sanelle*, 287 Or App 611, 630, 404 P3d 992 (2017), *rev den*, 362 Or 482 (2018). During the second interview, defendant made various incriminating statements including confessing to

---

[5] In light of our conclusion that the state failed to prove that defendant made a knowing, intelligent, and voluntary waiver of his Article I, section 12, rights prior to his conversation with the detectives in the parking garage or the second interview, we need not reach defendant's similar arguments in support of suppression under the Fifth Amendment. *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (we consider and dispose of all questions of state law before considering federal constitutional claims).

the crimes underlying his convictions in this case. "A defendant's direct admission bears an important relationship to a jury's determination of its verdict." *State v. Shaff*, 209 Or App 68, 76, 146 P3d 389 (2006), *rev'd on other grounds*, 343 Or 639, 175 P3d 454 (2007). Therefore, the court's error was not harmless.

In summary, the trial court erred when it declined to suppress defendant's statements from the second interview in the interview room, because the state failed to meet its burden of proving that defendant made a knowing, intelligent, and voluntary waiver of his Article I, section 12, rights.

Reversed and remanded.