Argued and submitted March 9; decision of Court of Appeals reversed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings October 29, 2020

# STATE OF OREGON,
*Respondent on Review,*

*v.*

# MICUS DUANE WARD,
*Petitioner on Review.*

## (CC C132352CR) (CA A163157) (SC S066598)

### 475 P3d 420

Defendant was indicted for aggravated and felony murder and moved to suppress statements made during two custodial interrogations as obtained in violation of his rights against self-incrimination under Article I, section 12, of the Oregon Constitution. The trial court found that officers conducting the first interrogation violated defendant's rights by continuing to question him after he unequivocally invoked his right to remain silent but that officers conducting the second interrogation obtained a valid waiver of defendant's rights under the circumstances. The Court of Appeals affirmed. *Held*: (1) An appellate court reviews the question of whether a waiver of Article I, section 12, rights against self-incrimination is knowing and intelligent, as it does the question of whether the waiver was voluntary, as ultimately a matter of law; (2) the state failed to meet its burden to prove that it obtained defendant's knowing, intelligent, and voluntary waiver before the second interrogation under the totality of the circumstances— including the initial violation of defendant's right to remain silent, the lack of a complete record of the interrogation that followed that violation, and the fact that defendant remained incarcerated following the violation for four days without being provided counsel; and (3) the trial court's error in admitting the statements from the second interrogation requires reversal of defendant's conviction.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

En Banc

On review from the Court of Appeals.*

Bear Wilner-Nugent, Bear Wilner-Nugent Counselor & Attorney at Law LLC, Portland, argued the cause and filed the briefs for petitioner on review.

_____
* Appeal from Washington County Circuit Court, Rick Knapp, Judge. 295 Or App 636, 437 P3d 298 (2019).

Patrick M. Ebbett, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Rosalind M. Lee, Rosalind Manson Lee LLC, Eugene, filed the brief for *amici curiae* Oregon Criminal Defense Lawyer's Association and Oregon Justice Resource Center.

FLYNN, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Balmer, J., dissented and filed an opinion.

**FLYNN, J.**

Defendant was convicted of aggravated and felony murder. After being arrested for that crime, and before being appointed counsel, defendant was twice interrogated while in custody. The trial court suppressed the statements that defendant made during the first interrogation, because the court determined that officers conducting that interrogation continued to question defendant after he invoked his right to remain silent, in violation of defendant's Article I, section 12, rights against self-incrimination. But the trial court refused to suppress defendant's statements from the second interrogation, because it determined that the officers who conducted that interrogation obtained a valid waiver of defendant's Article I, section 12, rights. The trial court thus suppressed statements that defendant made during the first interrogation but not those he made during the second interrogation. A jury found defendant guilty, and he was sentenced to life in prison without the possibility of parole.

On review, taking into account the totality of the circumstances, we conclude that the state failed to prove that defendant validly waived his rights before the second interrogation. Accordingly, we conclude that the trial court erred in denying defendant's motion to suppress, and we further conclude that the error requires a reversal of defendant's conviction and a remand for a new trial.[1]

## I.   INTRODUCTION TO ARTICLE I, SECTION 12

Before describing the relevant facts, we describe the basic constitutional principles that frame the dispute in this case. Article I, section 12, of the Oregon Constitution provides that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself." Or Const, Art I, § 12.[2] That constitutional provision guarantees a right to

---

[1] We also allowed review to consider whether the Eighth and Fourteenth Amendments to the United States Constitution prohibit a trial court from imposing life without the possibility of parole on a person with intellectual disabilities. Because we remand for a new trial, we do not reach defendant's sentencing argument.

[2] The Fifth Amendment to the United States Constitution is similar. It specifies that "[n]o person shall *** be compelled in any criminal case to be a witness against himself." US Const, Amend V. Defendant does not separately challenge the validity of his waiver under that federal provision.

remain silent and a "derivative or adjunct right to have the advice of counsel in responding to police questioning." *State v. Turnidge (S059155)*, 359 Or 364, 399, 374 P3d 853 (2016). As part of the constitutional guarantee, if a person in custody or other similarly compelling circumstances unequivocally invokes one of the rights guaranteed by Article I, section 12, rights, then "police must honor that request and stop questioning." *State v. McAnulty*, 356 Or 432, 455, 338 P3d 653 (2014) (citing *State v. Davis*, 350 Or 440, 459, 256 P3d 1075 (2011) ("[I]f there is a right to remain silent that is guaranteed by Article I, section 12, it is a right to insist that the police refrain from interrogation after a person who is in custody or otherwise in compelling circumstances has invoked the right to remain silent.")).

Even a person who has initially invoked those rights may later waive them, but the state bears the burden of proving a knowing, intelligent, and voluntary waiver "under the totality of the circumstances." *State v. Nichols*, 361 Or 101, 107, 390 P3d 1001 (2017). In addition to the general "totality of the circumstances" inquiry, to ensure that any waiver is knowing as well as voluntary, officers must provide a person with the so-called *Miranda* warnings—that the person "has a right to remain silent and to consult with counsel and that any statements that the person makes may be used against the person in a criminal prosecution."[3] *State v. Vondehn*, 348 Or 462, 474, 236 P3d 691 (2010). Those warnings are required for a valid waiver in part "[b]ecause a custodial interrogation is inherently compelling." *Id.*

## II.   FACTS AND PROCEEDINGS BELOW

With that legal overview as a guide, we describe the pertinent facts in a manner consistent with our obligation to accept "'the trial court's findings of historical fact if evidence in the record supports them.'" *See McAnulty*, 356 Or at 449 (quoting *State v. James*, 339 Or 476, 481, 123 P3d 251 (2005)).

---

[3] Oregon's *Miranda* warnings are named for the decision of the United States Supreme Court, which requires the same warnings under the Fifth Amendment to the United States Constitution. *Vondehn*, 348 Or at 470. On an independent state-law basis, this court has required the same warnings "to effectuate the protections afforded by Article I, section 12." *Id.*

The murder victim was the great-grandmother of defendant's cousin, Joda Cain, who lived with the victim in Washington County. Before the murder, Cain had purchased a plane ticket for defendant to fly from his home in Kansas City to Portland. Defendant, who was 19 at the time and has intellectual disabilities, boarded the plane without identification by falsely claiming to be a minor.[4] Cain and a friend picked defendant up from the airport and took him to the victim's home.

The friend fell asleep at the home around midnight and awoke to hear the victim screaming. He heard defendant demanding money and heard Cain say, "Just do it." The friend then heard sounds of someone being attacked, and he fled the house. The next morning, police found the victim's body in her bedroom. She had been beaten to death with a small sledgehammer that police found at the scene. A trail of blood led from the victim's bedroom to the garage, and her car was missing.

The same morning, a state trooper spotted the victim's car weaving erratically on the interstate in eastern Oregon. Cain was driving, and defendant was a passenger. After a high-speed chase, police forced the car to stop and arrested Cain. Defendant ran away but was quickly arrested, too. Evidence in the car and blood on defendant's clothes tied defendant to the murder.

An officer read defendant his *Miranda* warnings at the scene and then took him to the Union County Jail, where defendant was again given *Miranda* warnings and then interrogated. When one of the officers asked if defendant was "going to visit with us here today at all?" defendant gave a negative response that the officer acknowledged by asking, "No?"[5] But the officers then repeated *Miranda* warnings and continued the interrogation by telling defendant that Cain had decided to "be honest." They told defendant

---

[4] Messages offered at trial indicate that defendant did so at the direction of Cain, but the reason for defendant's deception is not relevant to our analysis.

[5] The trial court explained that it could not determine from the interrogation video whether defendant responded by shaking his head to indicate "no" or verbally indicated that he did not want to talk, but the court found that the officer's "no" was verbalizing a negative response by defendant.

that Cain had described the murder and car theft as entirely defendant's responsibility and encouraged defendant to give his "version of events." As described in defendant's brief, he "largely maintained his silence," but made at least some statements that the trial court suppressed.

After the interrogation, defendant was held at the Union County Jail for four days, until two detectives from Washington County arrived. Before driving defendant back to Washington County, the detectives read *Miranda* warnings to him, and defendant responded "yes" when asked if he understood those rights. During the four- to five-hour drive to Washington County, the detectives did not talk to defendant about the case. But upon arriving at the Washington County Sheriff's Office, the detectives took defendant into a "soft" interview room, meaning it was furnished more like a living room than a typical jail interview room.

At that point, without repeating *Miranda* warnings or asking defendant whether he wanted to waive his rights, the detectives began questioning defendant. Defendant answered questions without repeating his earlier assertion that he did not want to talk. The detectives made no threats or promises and described the tone of the interview as a "very relaxed conversation." Defendant's ability to communicate did not appear to the detectives "to be impaired by any sort of substance or mental problems," and his answers appeared to "make sense in a contextual fashion." In response to the questions, defendant denied knowing anything about the murder, denied ever being in the victim's bedroom, and denied having her blood on his clothing. He told the officers that Cain had woken him late at night asking if he wanted to go for a ride, and, when asked why he had run after police stopped the car, defendant answered that he was afraid he would go to jail for lying about his age when he flew to Portland.

Defendant was eventually indicted for two counts of aggravated murder and two counts of felony murder. Before defendant filed the pretrial motion to suppress that is at issue on review, the trial court conducted two other proceedings that are pertinent to defendant's arguments on review. In the first, the court found that defendant was

unfit to proceed with trial as a result of his intellectual dis-
ability and committed him to the Oregon State Hospital for
treatment. The court based that finding on the report from a
court-ordered psychological evaluation in which the author,
Dr. Stover, concluded that defendant had a "mild" intellec-
tual disability that made him unable to aid and assist his
attorney or meaningfully participate in his defense at that
time.

    Nine months later, the trial court held another
hearing and determined that defendant had the capacity to
stand trial. The court based that decision on a later report
from Dr. Stover, who had concluded that defendant "gained
trial competency" through education about the legal process,
although he recommended accommodations so that defen-
dant would better understand his attorneys' legal advice.
During the same hearing, the prosecutor confirmed that the
state would not be seeking the death penalty because it con-
ceded that defendant "does, in fact, suffer from an intellec-
tual disability" that would make it constitutionally imper-
missible to impose that penalty, under the United States
Supreme Court's decision in *Atkins v. Virginia*, 536 US 304,
122 S Ct 2242, 153 L Ed 2d 335 (2002).

    After the ruling that the case would proceed toward
trial, defendant moved to suppress the statements that he
had made to the officers during the first interrogation in
Union County and the second interrogation in Washington
County. The trial court agreed with defendant that the offi-
cers had violated defendant's rights during the first inter-
rogation by continuing to question him after he made an
unequivocal invocation of his right to remain silent. But
the court determined that defendant's statements from
the second interrogation, four days later, were admissible.
The court reasoned that defendant's earlier invocation of
his right to remain silent did not preclude the Washington
County interrogation because a "reasonable period of time"
had passed and the interrogation was conducted by new
officers who provided new *Miranda* warnings before inter-
viewing defendant in a "soft room." The court emphasized
that the officers had made "no threats or promises" and that
"there was nothing to indicate" to the officers "that there
was anything mentally or emotionally upsetting" defendant.

At trial, the state introduced defendant's statements from the second interview and argued that the statements were "provable lies" and, thus, evidence of defendant's "consciousness of guilt." The jury found defendant guilty of both aggravated murder and felony murder, and the court sentenced him to life in prison without the possibility of parole.

Defendant appealed and challenged multiple trial court rulings, including the court's denial of defendant's motion to suppress the statements from his second interrogation. Defendant argued that the state failed to meet its burden to prove that the second interrogation was supported by defendant's valid waiver of his rights under the circumstances of this case. He pointed to the earlier violation of his right to remain silent when the Union County officers ignored his invocation of that right, to the fact that he was held in custody for days without an opportunity to obtain legal advice (because appointment of counsel was delayed until after his arraignment upon arriving in Washington County), and to the fact that the renewed advice of rights was separated in time and distance from the interrogation in Washington County. Finally, he argued that the court could not ignore the circumstance of his intellectual disability, which he contended made the *Miranda* violation, the extended incarceration without access to legal advice, and the lack of contemporaneous warnings more significant for defendant than for the average person in custody. The Court of Appeals rejected defendant's challenges, and this court allowed review.

## III.   ANALYSIS

On review, defendant renews his argument that the trial court erred in concluding that defendant validly waived his *Miranda* rights prior to the Washington County interrogation, given "the peculiar factual circumstances of defendant's detention" combined with the "innate difficulties" created by his intellectual disability. Defendant points first to the officers' failure to honor his initial invocation of his right to remain silent, which, he argues, shaped his understanding of *Miranda* rights. Defendant also points to the fact that he was then held for four days without being "afforded an opportunity to have counsel appointed, much

less to meet with counsel," and that the Washington County interrogation took place hours after the detectives provided the second set of *Miranda* warnings—rather than when defendant's "recollection of his rights was fresh." Finally, defendant argues that the "unusual sequence of events" must be considered in the context of his "heightened susceptibility to failing to understand" his rights as a result of his intellectual disability.

The state insists that the trial court ruled correctly, but the state also raises a threshold issue regarding the standard by which we must review the trial court's ruling. We begin by addressing that preliminary issue.

A.   *Standard of Review*

On review, the state urges a distinction between the standard of review that applies to the question whether a defendant waived his rights "voluntarily" and the standard of review that applies to the question whether a defendant waived his rights "knowingly and intelligently." The state argues that, in evaluating whether the trial court erred, this court should treat as essentially a factual inquiry the question of whether defendant knowingly and intelligently waived his rights and should defer to the trial court's determination in that respect.[6] But appellate review of the trial court's waiver determination is not limited in the way that the state contends.

As the state acknowledges, whether the circumstances of a particular case demonstrate a *voluntary* waiver is a question of law that we review without deference to the trial court, although we are bound by the trial court's factual findings if there is evidence to support them. *See State v. Jackson*, 364 Or 1, 21, 430 P3d 1067 (2018) (analyzing the voluntariness of a statement as a question of law). The state also acknowledges that we have never held that a purely factual standard applies to whether a waiver was knowing and

---

[6] Although not entirely clear, it appears that the Court of Appeals may have accepted the state's characterization of the standard by which courts should review whether a waiver was knowing and intelligent. *See State v. Ward*, 295 Or App 636, 655, 437 P3d 298 (2019) (concluding that the record contains "constitutionally sufficient evidence for the trial court to find that defendant had knowingly and voluntarily waived his right to remain silent").

intelligent. However, the state views the standard of review for whether a waiver was knowing and intelligent as an open question, and it urges us to follow the Ninth Circuit, which has described as "essentially a question of fact" whether a waiver of federal *Miranda* rights was knowing and intelligent. *U.S. v. Doe*, 155 F3d 1070, 1074 (9th Cir 1998); *see also U.S. v. Rodriguez-Preciado*, 399 F3d 1118, 1127 (9th Cir 2005). Of course, we are not bound by decisions of the Ninth Circuit— or any other federal circuit—even on questions of federal law. *State v. Moyle*, 299 Or 691, 707, 705 P2d 740 (1985); *see also Van De Hey v. U.S. National Bank*, 313 Or 86, 95 n 9, 829 P2d 695 (1992) ("only decisions of the Supreme Court of the United States are binding on this court in the interpretation of federal law").[7] Thus, we understand the state to cite *Rodriguez-Preciado* merely as an example of persuasive analysis that this court should adopt for purposes of Article I, section 12.

We agree with the state's implicit premise—and that of the Ninth Circuit—that the inquiry into whether a waiver is knowing and intelligent can be distinct from the inquiry into whether the waiver was voluntary. *See State v. Haynes*, 288 Or 59, 64-65, 602 P2d 272 (1979) ("[K]nowledge of these [Article I, section 12,] rights is not conclusive on the separate issue of voluntariness."); *see also State v. Joslin*, 332 Or 373, 386, 29 P3d 1112 (2001) ("[D]efendant's waiver of that right under Article I, section 12, although voluntary, was not knowingly made and, therefore, was invalid."). We also emphasize that, regardless of whether the "knowing and intelligent" component of a valid waiver is—like the voluntariness component—a legal determination, the determination in a particular case will be based on underlying factual findings by which this court is bound if there is any evidence to support them. *See Jackson*, 364 Or at 21 (articulating rule with respect to voluntariness determination).

---

[7] With respect to issues arising under Article I, section 12, we have sometimes looked for guidance to Fifth Amendment decisions of the United States Supreme Court, "particularly" because that court first required "the warnings that this court later required to effectuate the protections afforded by Article I, section 12." *Vondehn*, 348 Or at 470. But *Vondehn* also makes clear that we must independently determine the scope of Article I, section 12, rights and, indeed, reached a different conclusion about the significance of a *Miranda* violation under Article I, section 12, than the US Supreme Court had reached under the Fifth Amendment. *Id.* at 475-76.

But the state fails to explain why we should be persuaded by the Ninth Circuit's rule that only one part of the valid-waiver test involves a legal question. Indeed, *Rodriguez-Preciado* provides no analysis for its rule that "knowingly and intelligently," unlike "voluntarily," should be reviewed as a factual determination. Nor does the case on which *Rodriguez-Preciado* relied, *Collazo v. Estelle*, 940 F2d 411, 416 (9th Cir 1991), or the case on which *Collazo* relied, *Derrick v. Peterson*, 924 F2d 813, 823 (9th Cir 1990), *overruled on other grounds by U.S. v. Preston*, 751 F3d 1008 (9th Cir 2014).

If this court has never expressly rejected the state's proposed bifurcated standard of review for the three components of a valid waiver, we do so now. This court's Article I, section 12, case law has treated the question of whether a waiver of constitutional rights was "knowing and intelligent" as ultimately a question of law, just as the question of whether the waiver is voluntary is ultimately a question of law. For example, in *State v. Singleton*, 288 Or 89, 602 P2d 1059 (1979), this court considered whether the defendant, who initially invoked his *Miranda* rights, validly waived those rights at a later point. After describing it as the state's burden "to demonstrate that the defendant knowingly and intelligently waived" his Article I, section 12, rights, this court explained that "the question of waiver is not simply a question of historical fact, but one which requires the application of constitutional principles to the facts as found." *Id*. at 104. This court then considered "the historic facts of this case in the light of the constitutional standards" and held that the defendant "made a knowing and intelligent waiver" of his constitutional rights. *Id*. at 108-09.

As our approach in *Singleton* illustrates, we review whether the state has proven a valid waiver as ultimately a legal question—"the application of constitutional principles to the facts as found"—even when the dispute focuses on whether the defendant "knowingly and intelligently" waived his Article I, section 12, rights. *Id*. at 104. *See also Haynes*, 288 Or at 70 (identifying information that, under certain circumstances, police categorically must provide to permit a determination that the defendant "knowingly and intelligently" waived Article I, section 12, right to counsel); *State v.*

*Acremant*, 338 Or 302, 321, 108 P3d 1139 (2005) (describing a single standard of review for whether a waiver is "knowing, intelligent, and voluntary under the totality of the circumstance"—that, "[a]lthough we are bound by its findings of historical fact, we review a trial court's conclusions regarding a defendant's waiver of the right to counsel for legal error"). Moreover, reviewing as a question of law all requirements for a valid waiver of Article I, section 12, rights aligns with how this court reviews other questions that bear on whether officers have honored those rights. *See State v. Avila-Nava*, 356 Or 600, 609, 341 P3d 714 (2014) ("[W]hether a defendant's statements amounted to an unequivocal invocation of the right against self-incrimination, an equivocal invocation, or no invocation at all, is a question of law," although "what a defendant said or did not say, is a question of fact.").

The state, nevertheless, argues that treating the knowledge requirement for a valid waiver as a question of fact is analogous to how we treat other "questions of a person's awareness and understanding." The state points, as examples, to cases that identify questions regarding a criminal defendant's mental state or condition as a question of fact for the jury to decide. *See State v. Herrera*, 286 Or 349, 360, 594 P2d 823 (1979) ("[T]he decision of whether the defendant has a mental disease or defect [for purposes of affirmative defense] is a question of fact for the jury" if there is enough evidence "to permit reasonable persons to conclude that the evidence preponderates in favor of a finding of mental disease or defect."); *State v. Wolleat*, 338 Or 469, 478, 111 P3d 1131 (2005) (in context of discussing the mental state element of kidnapping, explaining that, "in most cases the question of whether the defendant intended to interfere substantially with the victim's liberty will present a question of fact for the jury").

But those examples do not involve the standard for proving a waiver of a constitutional right. Rather, they describe statutory elements that must be proven for a jury to find a defendant guilty or not guilty of a crime—an inquiry that is inherently factual. *See State v. Lotches*, 331 Or 455, 498, 17 P3d 1045 (2000) (explaining that this court reviews a jury's finding of guilt "solely to determine whether a rational factfinder, viewing the evidence in the light most favorable to

the state, and accepting all reasonable inferences and credibility choices, could find the elements of the crime beyond a reasonable doubt"). By contrast, the question here involves whether the police violated defendant's constitutional rights by interrogating him without obtaining a valid waiver. As our past decisions indicate, we determine the answer to that ultimate question as a matter of law, although we defer to the trial court's findings of the underlying historical facts. *Acremant*, 338 Or at 321.

B.   *The Framework for Analyzing this Case*

As we have explained above, a defendant's statements obtained during a custodial interrogation are admissible only if the state proves that the defendant was given *Miranda* warnings and made a knowing, intelligent, and voluntary waiver of those rights under the *totality* of the circumstances. *Nichols*, 361 Or at 107.[8] We emphasize "totality" because the opinion of the Court of Appeals and the arguments advanced by the state both highlight individual circumstances that, in isolation, might demonstrate that defendant validly waived his Article I, section 12, rights.

The Court of Appeals first considered the impact of the earlier violation by asking if it "tainted" defendant's later statements to the extent that they "cannot properly be seen as the product of a truly voluntary waiver of the right against self-incrimination." *State v. Ward*, 295 Or App 636, 650, 437 P3d 298 (2019). The court answered that question by applying the standard that this court has established for determining whether a defendant's statements—or other evidence—must be suppressed solely as the product of the earlier constitutional violation. *Id.* at 650-53 (quoting and discussing *State v. Jarnagin*, 351 Or 703, 713-18, 277 P3d 535 (2012)). After concluding that the violation was not sufficiently egregious to require suppression by itself, the Court of Appeals looked separately at the delay between the

---

[8] In addition to determining whether the state proved a valid waiver of Article I, section 12, rights, some cases require a separate inquiry into whether statements following a waiver were voluntary. *See McAnulty*, 356 Or at 459 (analyzing validity of waiver and "voluntariness" of subsequent statements separately); *Acremant*, 338 Or at 321-25 (2005) (same). We do not understand defendant to contend that his statements were involuntary apart from his waiver argument.

*Miranda* warnings that the officers read immediately before driving defendant to Washington County and the interrogation that occurred several hours later. *Id.* at 654. With respect to that temporal gap, the court considered whether "a reasonable person could believe that his or her rights have changed since the time they were originally given," and the court concluded that the "circumstances did not require the police to readminister *Miranda* warnings closer in time to the interrogation." *Id.* at 654-55.

That analytical framework presents several challenges. First, *Jarnagin* expressly cautioned that the standard the Court of Appeals quoted does not apply to cases in which the question is whether the defendant validly waived his rights despite an earlier violation; rather, the standard "applies to derivative statements; *** a different calculus applies when a defendant remains in custody and officers seek to remedy an earlier *Miranda* violation."[9] 351 Or at 716 n 8. As we have emphasized, when the state contends that a defendant validly waived his rights despite an earlier violation, "there is a presumption that the waiver was involuntary and the state has a 'heavy burden' to demonstrate that the defendant knowingly and intelligently waived those rights." *Singleton*, 288 Or at 104. Second, by limiting the inquiry to whether the Washington County statements were the product of a voluntary waiver, the Court of Appeals overlooked the extent to which an earlier violation can affect whether a later waiver is knowing and intelligent, as well as voluntary. We have emphasized that a particular harm that occurs when police have refused to honor a suspect's invocation of Article I, section 12, rights is that the violation

---

[9] Although the resolution of this case ultimately does not turn solely on the effect of the initial violation, we caution that the Court of Appeals' application of the *Jarnagin* factors may have underestimated the significance of the Union County violation on defendant's later decision to speak with the Washington County officers. For example, the court reasoned that the nature of the violation in this case was not especially "flagrant," *Ward*, 295 Or App at 651, but this court has strongly suggested that such a conclusion should be limited to violations that consist of "the officers fail[ing] to recognize that the circumstances had become sufficiently compelling to require *Miranda* warnings." *State v. Swan*, 363 Or 121, 133, 420 P3d 9 (2018) (quoting *Jarnagin*, 351 Or at 717). As we emphasized in *Swan*, "by contrast" to cases like *Jarnagin*, when officers ignored the defendant's invocation of his Article I, section 12, right to counsel and asked numerous questions, "the violation was flagrant and repeated." *Id.* at 134.

may have "created the impression that the assertion of one's rights was meaningless." *State v. Foster*, 288 Or 649, 656, 607 P2d 173 (1980). Finally, considering whether the violation, alone, or the delay, alone, requires suppression of defendant's Washington County statements falls short of the question that ultimately concerns the court: whether the state proved, under the totality of the circumstances, that defendant made a knowing, intelligent, and voluntary waiver of the Article I, section 12, rights at the time of the Washington County interrogation. *See Nichols*, 361 Or at 107 (describing standard).

In addressing that question, the state's arguments in this court continue to focus too narrowly on only some of the relevant circumstances. Specifically, the state argues that it established a valid waiver with the evidence that defendant answered questions after having been advised of his *Miranda* rights and having indicated that he understood. If the state were drawing on a clean slate—without an earlier refusal to honor defendant's invocation of rights—then the state might be correct that it could prove a valid waiver with that evidence alone. *See Nichols*, 361 Or at 108 (concluding that those circumstances proved a valid waiver but emphasizing that "nothing in the record suggests a lack of knowledge, consent, or voluntariness about that decision"); *but see James*, 339 Or at 488-89 (rejecting suggestion that a suspect's statements made after *Miranda* warnings are "presumptively admissible"); *Joslin*, 332 Or at 383 (waiver not knowing and intelligent when officers failed to advise defendant both that "an identified lawyer has been hired or appointed and is seeking to consult with a suspect who is subject to custodial interrogation"). But the slate here was not clean. The state's argument fails to give adequate weight to the violation that preceded the Washington County interrogation, a circumstance that the state bears a "heavy burden" to overcome. *See Singleton*, 288 Or at 104.

When a suspect in custody exercises the right to remain silent, police must "scrupulously honor" that request. *McAnulty*, 356 Or at 461 (quoting *Michigan v. Mosley*, 423 US 96, 104, 96 S Ct 321, 46 L Ed 2d 313 (1975)); *Singleton*, 288 Or at 102 (same). When the prior violation consists of a failure to scrupulously honor a defendant's invocation of

his Article I, section 12, rights, it can have a particularly significant impact on a defendant's later decision to answer questions. *See State v. Swan*, 363 Or 121, 133-34, 420 P3d 9 (2018) (highlighting the distinction as affecting whether the violation is "egregious or flagrant" for purposes of determining if defendant's statements were tainted by an earlier *Miranda* violation); *Jarnagin*, 351 Or at 717 (same). Of particular concern, it can "create[] the impression that the assertion of one's rights was meaningless." *Foster*, 288 Or at 656. Thus, if the state fails to "scrupulously honor" a defendant's invocation of the right to remain silent, as we emphasized in *Singleton*, then the state bears a "heavy burden" to prove "that the defendant has subsequently waived those rights." 288 Or at 104.

In those cases in which we have held that the state proved a valid waiver despite a prior violation, we have pointed to countervailing circumstances that are absent from this record. For example, in concluding that the defendant in *McAnulty* had twice validly waived her *Miranda* rights following an earlier violation, we emphasized that the defendant first initiated the renewed conversation by asking to speak privately with the officers because "she had something to tell them." 356 Or at 453, 459. We also emphasized that, when the officers next interrogated the defendant in *McAnulty*, they had freshly advised the defendant of her *Miranda* rights immediately before the interrogation, and she had signed a form expressly acknowledging that she understood those rights. *Id.* Likewise in *Jarnagin*, in which we concluded that the defendant had validly waived his rights following an earlier unlawful interrogation, the defendant had agreed to be transported from his home to the police station to be interviewed and, upon arriving, was given *Miranda* warnings, signed a written consent, and made clear that he understood his rights by volunteering that he could "at any time, decide that [he] would like a lawyer or not answer any further questions." 351 Or at 712, 724.[10]

---

[10] In addition, as we highlighted in *Swan*, the *Miranda* violation in *Jarnagin* consisted of the less "egregious" failure "to recognize that the circumstances had become sufficiently compelling to require *Miranda* warnings." 363 Or at 133 (quoting *Jarnagin*, 351 Or at 717). Thus, *Jarnagin* identified the issue as "when belated *Miranda* warnings will and will not suffice." 351 Or at 721.

Indeed, we have pointed to similar circumstances as aiding the state's ability to prove a valid waiver, even in the absence of a prior constitutional violation. *See State v. Meade*, 327 Or 335, 341-42, 963 P2d 656 (1998) (even without a prior violation, affirmative waiver immediately following administration of *Miranda* warnings was "significant" to conclusion that the defendant validly waived his rights).

Here, however, the state can identify no similar circumstances that would aid the state in carrying its burden to overcome the harm of the prior violation. Defendant did not voluntarily travel to the Washington County interrogation room or in any way initiate a conversation about the crime. Although defendant answered "yes" when asked if he understood his rights, the state cannot point to the kind of affirmative statements that, in *Jarnagin*, demonstrated that the defendant had a meaningful understanding of the words that had been recited to him.[11] And the state cannot point to evidence that defendant affirmatively consented to be interrogated or affirmatively waived his rights. Indeed, the only evidence of officers asking defendant whether he wanted to speak with them is the evidence from Union County, and defendant's answer to those officers was that he did not want to talk.

Another circumstance that *can* ease the state's burden following a violation of a defendant's Article I, section 12, rights is a sufficient gap in time—at least if the gap is followed by fresh *Miranda* warnings. *See Jarnagin*, 351 Or at 722-23 (emphasizing the "substantial break in time"—during which the defendant remained with a friend in his own home—before he agreed to be interviewed at the police station, was given fresh warnings, and affirmatively consented to waive his rights). Here, the state emphasizes that, following the violation of defendant's rights, four days passed before the detectives provided new *Miranda* warnings, drove

_____

[11] We do not suggest that an inquiry into a defendant's degree of comprehension is required in the ordinary case. Indeed, in a case that did not involve overcoming the harm of a prior violation, we observed that "asking an accused whether he understands the warning given him does very little, if anything, to guarantee his understanding" and that "[w]e do not believe such an inquiry and an affirmative response is necessary in order to assure compliance with *Miranda*." *State v. Karcher*, 252 Or 564, 566-67, 451 P2d 110 (1969).

defendant to Washington County, and began a new interrogation. Given those circumstances, according to the state, "any taint had long since dissipated." But the state overlooks countervailing factors that undermine the value of the gap in time and fresh warning in this case.

First, any value that the passage of time might normally provide was diluted in this case by the fact that defendant was held in jail during that entire time without the benefit of advice from counsel. *See Foster*, 288 Or at 656-57. As we emphasized in *Foster*, in concluding that a waiver following a previous violation was not valid, the defendant had been held in custody "for over 30 hours" without the benefit of legal advice that the defendant had requested. *Id*. Similarly, in *State v. Mendacino*, we explained that the 72-hour gap between an unlawful interrogation and a later interrogation—preceded by fresh *Miranda* warnings—was insufficient to dissipate harm of the earlier violation because the defendant remained in jail and did not consult with an attorney between the interrogations. 288 Or 231, 238, 603 P2d 1376 (1979). Here, the state has offered no reason to conclude that the days of incarceration did anything to minimize the harm from the earlier violation.

Second, any value that the fresh *Miranda* warnings might normally have provided was undermined by the fact that the detectives gave those warnings at the start of the five-hour trip to Washington County. We agree with the Court of Appeals that a short delay and change of location, alone, generally will not preclude the state from proving a valid waiver. *See State v. Stevens*, 311 Or 119, 138, 806 P2d 92 (1991) ("mere transfer to another car and another officer did not necessarily require" renewed *Miranda* warnings).[12] But this is not a case in which delay and a change of location are the only obstacles to the state proving a valid waiver. Instead, the relevant circumstances, here, began with the officers in Union County ignoring defendant's invocation of his right to remain silent, then holding him in jail for

---

[12] In *Jarnagin*, we quoted LaFave for the proposition that it is "generally accepted that fresh warnings are not required after the passage of just a few hours." 351 Or at 725 (quoting Wayne R. LaFave, Jerold H. Israel, Nancy J. King, & Orin S. Kerr, 2 *Criminal Procedure* § 6.8(b), 805 (3d ed 2007)).

four days without the opportunity to speak with counsel. Thus, the question here is whether the manner in which the Washington County detectives provided new warnings was sufficient to overcome the harm of the prior violation—the impression that invoking Article I, section 12, rights is meaningless. *See Foster*, 288 Or at 656. Under the totality of the circumstances, the poorly timed warnings did little to help the state meet its burden.

Third, the state's ability to meet its burden is impaired by the limited record of what transpired as a result of the *Miranda* violation. Both parties in briefing have offered a general characterization of defendant's statements after he invoked his right to remain silent, but—as the Court of Appeals observed—"[t]he precise nature of those statements is uncertain based on the record from the suppression hearing." *Ward*, 295 Or App at 649 n 7. We addressed a similar record deficiency in *Swan*, in which we considered whether the state had met its burden to show that the defendant's decision to take a breath test was not the product of a DUII interview that the state conducted in violation of the defendant's Article I, section 12, rights. 363 Or at 133. The obstacle for the state in *Swan* was that there was no evidence of what the defendant said during the DUII interview and so "no way of knowing whether or how [the] defendant's decision to take the test was causally connected to his earlier responses." *Id.* at 136. Given the absence of evidence, we concluded that the state failed to meet its burden. *Id.*

The record in this case presents a similar obstacle for the state. As the Court of Appeals noted, the record reveals that the state played a video recording of the unlawful Union County interrogation only up to a point shortly after defendant invoked his right to remain silent, and "[t]here is no indication that the court also was provided with a transcript of the interrogation or otherwise reviewed what defendant said to the police after invoking his rights under *Miranda*." *Ward*, 295 Or App at 649 n 7. Thus, when the trial court ruled at the conclusion of the suppression hearing that defendant provided a knowing, intelligent, and voluntary waiver, it necessarily did so with "no way of knowing whether or how" statements that defendant or the officers

made during the earlier, unlawful interrogation affected defendant's decision to answer questions when he reached Washington County. *See Swan*, 363 Or at 136. Accordingly, we cannot assume that the court made any implicit findings regarding the course of the unlawful interrogation that could help the state meet its heavy burden to prove that defendant subsequently validly waived his Article I, section 12, rights.

Finally, defendant argues that all of the other circumstances that he has identified as preventing proof of a valid waiver must be filtered through the lens of his established intellectual disability, which he describes as creating a "heightened susceptibility" to not understanding his rights. In general, we agree that a defendant's mental limitations should be considered when determining whether the defendant made a knowing, intelligent, and voluntary waiver under the totality of the circumstances. *See Jackson*, 364 Or at 30 ("a defendant's mental condition is a factor that must be considered, as part of the totality of the circumstances, in determining whether a defendant's confession was voluntary"); *see also Meade*, 327 Or at 341 (even without a prior violation, identifying as "significant" to valid waiver inquiry the fact that the defendant was "highly educated"). The state contends, however, that defendant failed to preserve this argument regarding his mental disability. Defendant offers a complicated response that relies on a statement in one written memorandum that his challenge to the Washington County interrogation "incorporated by reference" arguments from an earlier memorandum and on the fact that the judge who decided the suppression motion had earlier presided over the hearings regarding defendant's competence to stand trial. He urges this court to analyze the record below in light of the purposes of preservation. We decline to undertake that analysis, however, because we conclude that this case does not turn on the role of defendant's intellectual disability. Considering all of the other circumstances that we have identified—from the Union County officers' failure to honor defendant's initial invocation of his right to remain silent, which shaped his understanding of his rights; to the extended period of incarceration without counsel; to the significant separation

by time and distance between new *Miranda* warnings and
the interrogation in Washington County; to the absence of
evidence that defendant initiated conversation or affirma-
tively waived his rights—we are persuaded that the state
failed to prove that it obtained defendant's knowing, intelli-
gent and voluntary waiver of his Article I, section 12, rights
before the Washington County custodial interrogation.[13]
Accordingly, the trial court erred in denying defendant's
motion to suppress his statements from the Washington
County interrogation.

C.   *Significance of the Erroneously Admitted Statements*

We also conclude that the error is one that requires
us to reverse defendant's conviction. That determination is
governed by Article VII (Amended), section 3, of the Oregon
Constitution, which provides, in part:

> "If the supreme court shall be of opinion, after consider-
> ation of all the matters thus submitted, that the judgment
> of the court appealed from was such as should have been
> rendered in the case, such judgment shall be affirmed, not-
> withstanding any error committed during the trial[.]"

Or Const, Art VII (Amended), § 3. We have described our
obligation under that provision as one "to decide whether
there was 'little likelihood' that the error affected the jury's
verdict." *McAnulty*, 356 Or at 460 (quoting *State v. Davis*,
336 Or 19, 32, 77 P3d 1111 (2003)). In *McAnulty*, we con-
cluded that the erroneous admission of some of the defen-
dant's statements did not require reversal "on the particular
facts" of that case because the illegally obtained statements

---

[13] This case does not call upon us to specify where the state fell short in its
proof of a knowing, intelligent, and voluntary waiver. Although we have occasion-
ally described a waiver as invalid solely because it was not voluntary or solely
because it was not knowingly made, we have also identified circumstances that
affect all three components of a valid waiver. *See, e.g.*, *Vondehn*, 348 Or at 474
(*Miranda* warnings "ensure that a person's waiver is knowing as well as volun-
tary"). Our discussions in *Singleton* and *Foster* suggest that ignoring a suspect's
assertion of Article I, section 12, rights can similarly affect all three components
of the inquiry. *Foster*, 288 Or at 656-57 (explaining that the violation "created the
impression that the assertion of one's rights was meaningless"); *Singleton*, 288
Or at 104 ("when in such a case it is contended by the state that the defendant
has subsequently waived those rights there is a presumption that the waiver was
involuntary and the state has a 'heavy burden' to demonstrate that the defendant
knowingly and intelligently waived those rights").

described the same kind of abusive conduct against the victim that the defendant later described in legally obtained statements that we described as "more substantial admissions" of abuse of the victim. *Id.* at 460-61. Indeed, we concluded that the erroneous admission was "harmless beyond a reasonable doubt" (the federal constitutional standard). *Id.* at 462. We reasoned that "the jury would have regarded the improperly admitted evidence as duplicative or unhelpful," relying on but distinguishing *Davis*, in which this court reversed after concluding that erroneously excluded evidence was "influential because it substantiated the defendant's version of events," was not "'duplicative or unhelpful' to the jury," and was "not cumulative, because the excluded evidence was 'qualitatively different than the evidence that the jury heard.'" *Id.* at 460-61 (quoting *Davis*, 336 Or at 33-34).

Here, defendant explains that his illegally obtained statements consisted of a series of easily disproven factual assertions, including denying that he had ever been in the victim's room and denying that the victim's blood had been on his clothing. Defendant emphasizes that the value to the state of offering defendant's denials of easily proven facts was that they tended to indicate defendant's consciousness of guilt. Indeed that is precisely the use that the state made of the evidence: The prosecutor argued to the jury in closing that "provable lies still are an indicator of one's consciousness of guilt" and added, "[W]ho lies to police, innocent people or guilty people? I think you'll all agree guilty people do." As in *Davis*, we conclude that the illegally obtained statements provided the jury with evidence of defendant's mental state that was qualitatively different than the other evidence that the state presented and tended to substantiate the state's theory that not only was defendant in the victim's room, but he also actively participated in the victim's murder. Under the circumstances, we cannot conclude that there was "little likelihood" that the error affected the verdict. Accordingly, we reverse and remand.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**BALMER, J.,** dissenting.

I respectfully dissent. The facts of this case are tragic. The evidence at trial showed that defendant, who has intellectual disabilities, likely was manipulated by his cousin, Joda Cain, to engage in criminal conduct with Cain during which defendant killed the victim—Cain's great-grandmother—with a hammer. A jury convicted defendant of aggravated murder and felony murder, and he was sentenced to life in prison without possibility of parole.

The majority reverses defendant's convictions and remands the case for a new trial; as a result, it does not reach defendant's constitutional challenges to his sentence. The majority concludes that the trial court, although it granted defendant's motion to suppress statements that he made during an October 5, 2013, interview with police, erred in denying the motion as to statements during a second interview on October 9. It also concludes that the error was not harmless. I disagree with both of those conclusions.

The sequence of events concerning defendant's statements is straightforward. On October 5, 2013, the night that the victim was killed in Washington County, Cain and defendant were apprehended in eastern Oregon after a high-speed car chase. Police read defendant his *Miranda* rights at the time of his arrest. Defendant acknowledged that he understood those rights. Later that night, police interviewed defendant at the Union County Jail and again administered *Miranda* warnings. They had already talked to Cain, who told them that defendant had killed the victim. The police asked whether defendant wanted to talk, and although he indicated that he did not, they nevertheless asked him for his side of the story. Defendant denied any wrongdoing. On October 9, two detectives arrived from Washington County to return defendant to Hillsboro. Those officers also gave defendant *Miranda* warnings. As the majority notes, defendant said that he understood his rights, but he did not indicate whether he wanted to talk. No questioning occurred during the five-hour drive. Back in Washington County later that day, defendant was interviewed in the sheriff's office. The officers did not repeat the *Miranda* warnings or ask defendant whether he wanted to waive his rights.

Defendant responded to the officers' questions. His answers were consistent with his more general response during the October 5 interview—that he didn't do anything wrong.

On defendant's motion to suppress his statements, the trial court concluded that the October 5 statements should be suppressed because he had indicated to the officers that he did not want to talk, and they had improperly continued their questioning after that refusal. As to the October 9 statements, the trial court concluded that "defendant's *Miranda* rights were appropriately read to him" by the Washington County officers, that "he understood those rights," and that he "knowingly waived" them.

The Court of Appeals affirmed the trial court ruling. *State v. Ward*, 295 Or App 636, 437 P3d 298 (2019). It recognized the factors that we identified in *State v. Jarnagin*, 351 Or 703, 277 P3d 535 (2012), as being critical to the assessment of whether the waiver of the right to remain silent was "truly voluntary." *Ward*, 295 Or App at 650. It specifically noted that "a *Miranda* waiver may be tainted by a prior *Miranda* violation." *Id.* Determining whether such a taint exists "is fact intensive" and requires the court to decide, "'considering all the circumstances,'" whether a defendant's decision to speak to officers "'is sufficiently a product of an earlier *Miranda* violation that suppression is necessary to vindicate'" the defendant's rights. *Id.* (quoting *Jarnagin*, 351 Or at 717). As to the impact of the October 5 *Miranda* violation, the court noted that the violation was "not especially 'flagrant'" or coercive, compared to other cases where a later waiver was held to be involuntary; the officers had not used "flagrantly coercive tactics in an effort to elicit an incriminating response." *Ward*, 295 Or App at 651. Indeed, "defendant maintained his innocence throughout the exchange and made no patently inculpatory remarks." *Id.* The court carefully examined each of the *Jarnagin* factors, *id.* at 651-54, as well as defendant's argument that the delay between the *Miranda* warnings given the morning of October 9 and the interview five hours later constituted an Article I, section 12, violation, *id.* at 654-55. It discussed in detail the trial court record, comparing the facts in the case to earlier cases from this court and the Court of Appeals. It understood that it was required to base its determinations on the

totality of the circumstances. *Id.* at 650, 654, 655. The Court of Appeals did everything our precedents ask of it.

The Court of Appeals ultimately concluded that defendant's October 9 statements were not derived from or the product of the October 5 *Miranda* violation and that police were not required to give additional *Miranda* warnings later on October 9, after the initial warning before the drive. *Id.* at 655. The court concluded that there was "constitutionally sufficient evidence for the trial court to find that defendant had knowingly and voluntarily waived his right to remain silent on October 9." *Id.*

When the Court of Appeals has applied what is essentially the correct legal standard, the fact that this court might disagree with the lower court's application of the law to the facts of a particular case is usually not a reason to allow review. That is simply "error correction," because the case does not necessarily "present[ ] a significant issue of law." ORAP 9.07(1). To be sure, we sometimes do allow review simply in order to correct errors by lower courts, including the Court of Appeals, and I do not disagree with that practice. But we should do so sparingly, and I do not think we should have allowed review here.

That said, the majority does provide some clarification of the proper consideration of whether a waiver of rights under Article I, section 12, of the Oregon Constitution is "voluntary," "knowing," and "intelligent." 367 Or at 196-200. As with many other determinations that trial courts and juries make, and that appellate courts are charged with reviewing, those determinations may "ultimately" be legal questions that courts review for "legal error." However (as the majority recognizes), those legal conclusions are crucially based on facts—evidence and permissible inferences and presumptions—that are found by factfinders. And, as the majority again correctly observes, we are bound to accept those underlying factual findings "if there is any evidence to support them." 367 Or at 197. I agree with the majority's description of those distinctions.

But the majority discusses those issues primarily to reject the state's arguments to this court. The majority faults the Court of Appeals' approach to the Article I, section 12,

analysis, stating that it "may have accepted the state's characterization" of the "knowing and intelligent" inquiry as essentially factual, and thus subject to a more deferential standard of review. 367 Or at 196 n 6. It reaches that conclusion based on the Court of Appeals' statement that there was "constitutionally sufficient evidence for the trial court to find" a knowing and voluntary waiver. *Id.* (quoting *Ward*, 295 Or App at 655). That is not a very charitable reading of the Court of Appeals' decision. Perhaps the Court of Appeals should have said that there was a "sufficient factual basis for the trial court to reach the legal conclusion that defendant had made a knowing, intelligent, and voluntary waiver." That, after all, is what the Court of Appeals plainly meant when it used the sentence quoted by the majority to sum up its previous nine pages of detailed analysis of the factual record and the controlling case law. More importantly, the approach taken by the Court of Appeals—the consideration of the various factors we identified in *Jarnagin* and the comparison to cases such as *State v. Mendacino*, 288 Or 231, 603 P2d 1376 (1979), and *State v. McAnulty*, 356 Or 432, 338 P3d 653 (2014)—is essentially the same kind of careful review that the majority undertakes. The majority gives greater weight to certain facts than the Court of Appeals did, and, as a result, reaches a different legal conclusion.[1] But, in my view, little in the majority opinion articulates a substantially different rule of law than the Court of Appeals applied or identifies a serious analytical error, other than that court's ultimate legal conclusion regarding the validity of defendant's waiver.

Of course, it is within the authority of this court to review Court of Appeals' legal rulings, including its

---

[1] For example, the majority, although agreeing with the Court of Appeals that resolution of the *Miranda* issue "does not turn solely on the effect of the initial violation," nevertheless concluded that that court "may have underestimated the significance" of the earlier violation. 367 Or at 201 n 9. Similarly, the majority acknowledges that the Court of Appeals considered both the possible taint from the earlier *Miranda* violation and the delay between the new *Miranda* warnings given before the drive to Washington County and the questioning several hours later, but it nevertheless asserts that the Court of Appeals failed to consider those factors together as part of the "totality of the circumstances." 367 Or at 202. But the Court of Appeals *did* understand that it was required to determine whether defendant's waiver was "knowing, intelligent, and voluntary under the totality of the circumstances," *Ward*, 295 Or App at 650 (internal quotations omitted), and it appears to me that it did so.

application of legal standards to specific circumstances. I agree with the Court of Appeals' assessment of the totality of the circumstances as meeting the standard required for a valid waiver. But the legal issue is a close one, and although the majority reaches a different conclusion, its legal analysis does not appear to me to differ significantly from that of the Court of Appeals. For that reason, we probably should not have allowed review of this case.

I turn to the question of whether the error found by this court—the trial court's failure to suppress defendant's statements during the October 9 interview—was prejudicial, that is, whether there was little likelihood that the error affected the jury's verdict. *McAnulty*, 356 Or at 460.

The majority sets out defendant's statements: that he didn't know anything about the murder, hadn't been in the victim's bedroom, and didn't have the victim's blood on his clothes; that Cain had awakened him at night and asked if he wanted to go for a ride; that he had run when he and Cain were stopped by police in eastern Oregon because he was afraid he would go to jail for lying about his age when he had flown to Portland. 367 Or at 193. The majority concludes that, because defendant's statements were lies that could easily be disproved, they indicated defendant's "consciousness of guilt," *id.* at 209, and thus "tended to substantiate the state's theory that * * * [defendant] actively participated in the victim's murder." *Id.* Even if that were true, given the other evidence presented at trial, it is apparent that defendant's statements provided little additional probative evidence of his guilt.

*Miranda* warnings were first developed to protect against coerced confessions of guilt, truthful or not. Of course, defendant's statements here are not those kinds of statements: nothing defendant said could remotely be considered a true (or false) confession. Nor are they the kind of partially inculpatory statements that might give police leads to seek other evidence of defendant's guilt. And, because defendant did not testify, they were not used for impeachment purposes.

Yes, defendant's statements were easily disproved. But the overwhelming evidence that disproved them would

have been front and center in the trial in any event, as it will be in any re-trial. That evidence demonstrates there is little likelihood that the statements affected the jury's verdict. On the night of the murder, several of Cain's friends partied at the victim's home, along with Cain and defendant, and they saw defendant wearing a pair of football gloves that belonged to Cain. One of those gloves was later found in the getaway car near where defendant was sitting in the passenger seat. The glove had the victim's blood on it and her Rolex watch inside. Defendant's shirt, pants, and shoes all had the victim's blood on them. There was no blood on Cain's shoes. (Cain's clothes had been inadvertently washed when he was first incarcerated after being arrested.) A button was missing from one of defendant's shirts, and it was found in the victim's room. Another person at the victim's home fell asleep after the party, but awoke to hear the victim screaming. He testified that the victim said, "Stop, stop."; "No more, no more"; and "I'll give you $1,000." He also said that he heard defendant ask, "Where's the money?" in a loud voice, and that he heard Cain say, "Just do it[.]" And he heard "rumbling" that sounded like "someone *** being attacked."

In the face of that testimonial and physical evidence, defendant's statements would not have affected the jury's verdict. Defendant's theory at trial was that, although defendant also had been in the victim's bedroom, Cain had killed the victim. Defendant argued that his intellectual disability helped explain why he did not leave while the attack was taking place (as did Cain's other friend who was in the house), try to stop Cain, or seek help for the victim. Defendant also sought to show that he was manipulated by Cain to come to Portland as part of Cain's plan to rob, and perhaps harm, the victim, manipulation made easier by defendant's intellectual disability. Although the majority emphasizes that defendant's easily proven lies "tended to indicate defendant's consciousness of guilt," 367 Or at 209, that much would have been obvious to the jury from defendant's acknowledgment that he had been in the victim's room, the testimonial and physical evidence of his involvement in the victim's death, and the evidence that defendant had attempted to flee when police stopped the car in eastern Oregon. As a result, to the extent that defendant's denials

of involvement were easily disproved and therefore might have been evidence of his "consciousness of guilt," those statements were of little additional probative value, given the other evidence at trial.

There was little likelihood that the error here, if error it was, affected the jury's verdict. And, of course, all the evidence set out above will almost certainly be introduced at the re-trial, and the result will almost certainly be the same.

I respectfully dissent.